Filed 5/6/19
Unmodified opinion attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Petitioner,<br><br>        v.<br><br>SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF LOS ANGELES,<br><br>        Respondent;<br><br>J.C. PENNEY CORPORATION, INC., et al.,<br><br>        Real Parties in Interest. | No. B292416<br><br>(Los Angeles County Super. Ct. No. BC643036)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:*

It is ordered that the opinion filed herein on April 16, 2019 be modified as follows:

On page 19, line 18, in footnote 13, insert "potentially" after "situation"

On page 19, lines 19 and 20, in footnote 13, delete "is necessarily the "prevailing" price at which it is sold" and substitute "could be determined to be the "prevailing" price at which it is sold, upon an adequate factual showing."

On page 29, line 16, after "not," insert "necessarily"

On page 29, line 18, delete "may not" and substitute "must establish why they may"

On page 29, line 32, in footnote 18, insert "in this writ proceeding" after "contend"

On page 29, line 33, in footnote 18, after "speech," insert the following sentence:

"Nothing in this opinion should be understood to preclude real parties from litigating that contention in further proceedings."

On page 36, lines 25 and 26, delete "necessarily constitutes the item's prevailing market price at the time the actual price is advertised" and substitute "may constitute the item's prevailing market price at the time the actual price is advertised, as alleged in the complaints."

On page 36, line 29, between "In our view," and "that," insert "on demurrer,"

On page 37, line 5, delete "properly determined on the basis of sales of that item only" and substitute "potentially determined on the basis of sales of that item only, as alleged in the complaints."

On page 37, line 9, following "facts," insert the following footnote:

"Nothing in this opinion should be understood to resolve whether the market prices for some or all of real parties' alleged exclusive in-house goods are, in fact, properly determined solely by real parties' prices for those items."

Real parties' petition for rehearing is denied.  The modification does not change the judgment.

_____

*MANELLA, P.J.      WILLHITE, J.      CURREY, J.

Filed 4/16/19
Unmodified opinion

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | |
| Petitioner, | No. B292416 |
| v. | (Los Angeles County Super. Ct. No. BC643036) |
| SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF LOS ANGELES, | |
| Respondent; | |
| J.C. PENNEY CORPORATION, INC., et al., | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDINGS in mandate. Carolyn B. Kuhl, Judge. Petition granted.

Lieff Cabraser Heimann & Bernstein, Michael W. Sobol, Roger N. Heller, Katherine C. Lubin, Facundo Bouzat; Michael N. Feuer, City Attorney, Thomas H. Peters, Chief Assistant City Attorney and Michael J. Bostrom, Assistant City Attorney for Petitioner.

Nelson & Fraenkel, Gretchen M. Nelson, and Gabriel S. Barenfeld for Amicus Curiae on behalf of Petitioner.

Gibson, Dunn & Crutcher, Mark A. Perry; Christopher Chorba, Bradley J. Hamburger, Lauren M. Blas, Ryan S. Appleby; Sheppard, Mullin, Richter & Hampton, Moe Keshavarzi, Robert H. Philibosian, and A. Alexander Kuljis, and Fred R. Puglisi for Real Party in Interest, J.C. Penney Corporation, Inc.

Morgan, Lewis & Bockius, Joseph Duffy and Joseph Bias, for Real Party in Interest, Sears, Roebuck & Co. and Sears Holding Management Corp.

Arnold & Porter Kaye Scholer, James F. Speyer, and Alex Beroukhim, for Real Party in Interest, Kohl's Department Stores, Inc.

Steptoe & Johnson, Stephanie A. Sheridan, Anthony J. Anscombe, Meegan B. Brooks; Macy's Law Department and Brian Michael Parsons for Real Party in Interest, Macy's, Inc.

Munger, Tolles & Olson, Mark R. Yohalem and Ariel C. Green for Amicus Curiae on behalf of Real Parties in Interest.

No appearance for Respondent.

_____

In the underlying actions, petitioner Los Angeles City Attorney, acting in the name of the People of the State of California, asserted claims under, inter alia, Business and Professions Code section 17501 against real parties in interest, alleging that they sold products online by means of misleading, deceptive or untrue statements regarding the former prices of those products. Real parties demurred to the claims, asserting that the statute contravenes free speech rights and is void for vagueness. After the trial court sustained real parties' demurrer without leave to amend on the ground that the statute was void for vagueness as applied to real parties, petitioner sought relief by mandamus in this court. We conclude that real parties failed to demonstrate any constitutional defect in the statute on demurrer, and thus grant the relief requested.

**FACTUAL AND PROCEDURAL BACKGROUND**

2

On October 20, 2017, petitioner filed the first amended complaints in the four underlying actions, which are directed separately against real parties J.C. Penney Corporation, Inc. (J.C. Penney), Kohl's Department Stores, Inc. (Kohl's), Macy's Inc. (Macy's), and Sears, Roebuck and Co. and Sears Holdings Management Corporation (collectively, Sears).[1] Each complaint asserted a claim under the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.), a claim under the false advertising law (FAL)(Bus. & Prof. Code, § 17500 et seq.), and a claim under Business and Profession Code section 17501, which is a provision of the FAL.[2] Petitioner sought civil penalties, together with declaratory and injunctive relief.[3]

According to the complaints, real parties engaged in misleading, deceptive, or false advertising by offering goods for sale online at prices discounted from so-called "reference prices" that purported to reflect real parties' own former prices, but which did not do so. The complaints assert that each real party "deliberately and artificially sets the false reference prices higher than its actual former sales prices so that customers are deceived into believing that they are getting a bargain when purchasing products."

Real parties demurred to the complaints, contending, inter alia, that the section 17501 claims failed because the statute unconstitutionally limits truthful speech and is void for vagueness. The trial court sustained the demurrer to the section 17501 claims without leave to amend, on the ground that the statute is unconstitutionally vague as applied to real parties. The court denied real parties' demurrers to the other claims.

---

[1] For simplicity, we treat the action against Sears as involving a single retail entity.

[2] All further statutory citations are to the Business and Professions Code, unless otherwise indicated.

[3] At the request of real parties, the trial court ordered portions of the complaint be sealed.

3

On September 4, 2018, the City Attorney filed his petition for writ of mandate, seeking relief from the ruling regarding the section 17501 claims. We issued an order to show cause why that ruling should not be vacated.[4]

## DISCUSSION

Petitioner contends the trial court erred in sustaining the demurrer to the section 17501 claims. As explained below, we agree.

Regarding real parties' challenge to section 17501 as an unconstitutional regulation of free speech, as a preliminary matter we reject petitioner's contention that the statute targets only false, misleading or deceptive commercial speech (see pt.C.2.b., *post*). We agree with real parties that the plain language of the statute restricts protected commercial speech and thus, the statute is subject to the test for constitutional validity set forth in *Central Hudson Gas & Elec. v. Public Serv. Comm'n* (1980) 447 U.S. 557, 566 (*Central Hudson*). Because the undeveloped record before us is inadequate to apply that test, real parties' "free speech" challenge necessarily fails on demurrer (see pt.C.2.b., *post*).

Regarding real parties' contention that section 17501 is void for vagueness, we conclude they have offered neither a successful facial challenge -- that is, an attack on the general validity of the statute -- nor a successful challenge based on the statute's application to them. We reject at the threshold their contention that a specific rule for evaluating facial challenges was abrogated in *Johnson v. United States* (2015) ___ U.S. ___ [135 S.Ct. 2551] (*Johnson*). Under that rule, as set forth in *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.* (1982) 455 U.S. 489, 500 (*Hoffman Estates*) and *Holder v. Humanitarian Law Project* (2010) 561 U.S. 1, 18 (*Holder*), a facial challenge fails if the statute clearly applies to some or all the challenger's conduct. We conclude that the rule retains its vitality post-*Johnson* and is properly employed here (see pt.D.2.a.ii., *post*).

---

[4]     After issuing the order to show cause, we granted requests from Consumer Attorneys of California and from the Retail Litigation Center, Inc., the National Retail Federation, the California Retailers Association, and the Chamber of Commerce of the United States of America to submit briefs as amici curiae.

Applying that rule, we conclude the facial challenge fails even if the statute's impact on protected speech triggers a higher standard for clarity, as the statute clearly applies to some of the misconduct alleged in the complaints, and is not inherently unworkable or devoid of guidance to retailers (see pt.D.3.b.i., *post*). For the same reasons, we reject the "as-applied" challenge, insofar as it pertains to that alleged misconduct. With respect to the remaining misconduct alleged in the complaints, we conclude the record is insufficient to support a successful "as-applied" challenge on demurrer. (see pt.D.3.b.ii., *post*).

A. *Standard of Review*

"Because a demurrer both tests the legal sufficiency of the complaint and involves the trial court's discretion, an appellate court employs two separate standards of review on appeal. [Citation.] . . . Appellate courts first review the complaint de novo to determine whether [the] complaint alleges facts sufficient to state a cause of action under any legal theory, [citation], or in other words, to determine whether [] the trial court erroneously sustained the demurrer as a matter of law. [Citation.]" (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 879, fn. omitted (*Cantu*).) Moreover, "[i]f another proper ground for sustaining the demurrer exists, this court will still affirm the demurrer[] even if the trial court relied on an improper ground . . . ." (*Id.* at p. 880, fn. 10.)

"When reviewing a demurrer on appeal, appellate courts generally assume that all facts pleaded in the complaint are true. [Citation.]" (*Cantu, supra*, 4 Cal.App.4th at p. 877, fn. omitted.) We also assume the truth of facts that may be inferred from those pleaded (*Mead v. Sanwa Bank California* (1998) 61 Cal.App.4th 561, 564 (*Mead*)) but disregard unsupported factual conclusions (*id.* at p. 568), as well as legal conclusions (*Schep v. Capital One, N.A.* (2017) 12 Cal.App.5th 1331, 1336 (*Schep*)). Furthermore, "[t]he complaint should be read as containing the judicially noticeable facts, 'even when the pleading contains an express allegation to the contrary.'" (*Cantu, supra*, 4 Cal.App.4th at p. 877, quoting *Chavez v. Times-Mirror Co.* (1921) 185 Cal. 20, 23.) An appellate court may take judicial notice of facts not subject to judicial notice by the trial court. (*Taliaferro v. County of Contra Costa* (1960) 182 Cal.App.2d 587, 592.)

"Second, if a trial court sustains a demurrer without leave to amend, appellate courts determine whether . . . the plaintiff could amend the complaint to state a cause of action.  [Citation.]"  (*Cantu, supra,* 4 Cal.App.4th at p. 879, fn. 9.)

B.  *Governing Principles*

The key issues here concern the constitutionality and interpretation of section 17501, which constitute questions of law we resolve de novo. (*Samples v. Brown* (2007) 146 Cal.App.4th 787, 799.)  Real parties offer both facial and as-applied constitutional challenges to the statute.  A facial challenge "considers only the text of the measure itself, not its application to the particular circumstances of an individual."  (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 (*Tobe*).)  In contrast, an as-applied challenge "contemplates analysis of the facts of a particular case or cases to determine the circumstances in which the statute or ordinance has been applied and to consider whether in those particular circumstances the application deprived the individual to whom it was applied of a protected right.  [Citations]." (*Ibid.*)

A party challenging the constitutionality of a statute ordinarily must carry a heavy burden.  "Facial challenges to statutes . . . are disfavored. Because they often rest on speculation, they may lead to interpreting statutes prematurely, on the basis of a bare-bones record.  [Citation.] . . . [¶] Accordingly, we start from 'the strong presumption that the [statute] is constitutionally valid.'  [Citations.]  'We resolve all doubts in favor of the validity of the [statute].'  [Citation.]  Unless conflict with a provision of the state or federal Constitution is clear and unmistakable, we must uphold the [statute].  [Citations.]"  (*Building Industry Assn. of Bay Area v. City of San Ramon* (2016) 4 Cal.App.5th 62, 90.)  In the case of an as-applied challenge, the pertinent party "must plead and prove the specific facts giving rise to the alleged constitutional violation.  [Citation.] To prevail, the [party] must establish the particular application of the statute violates the [party's] constitutional rights.  [Citation]." (*Coffman Specialties, Inc. v. Department of Transportation* (2009) 176 Cal.App.4th 1135, 1145.)

To the extent we must construe section 17501, our inquiry applies established principles.  "The objective of statutory interpretation is to

6

ascertain and effectuate legislative intent. To accomplish that objective, courts must look first to the words of the statute, giving effect to their plain meaning," with an eye to "avoid[ing] a construction making a statutory term surplusage or meaningless." (*In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1437.) However, "the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.]" (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.) In addition, "[b]oth the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379,1387.)

Here, the record presented to the trial court contains no legislative history relating to Business and Professions Code section 17501. On our own motion, we have taken judicial notice of former Penal Code section 654a -- the predecessor of Business and Professions Code section 17501 -- and the legislative acts enacting those statutes. (*Boghos v. Certain Underwriters at Lloyd's of London* (2005) 36 Cal.4th 495, 505, fn. 6.)

The trial court, in sustaining real parties' demurrer, considered two documents authorized by the Attorney General of the State of California: a 1957 opinion that interprets aspects of section 17501 (30 Ops.Cal.Atty.Gen. 127 (1957)), and a 1984 committee report that proposed a replacement statute (Report of the Attorney General's Committee on Sale and Comparative Price Advertising (April 1984)).[5] Only the 1957 opinion provides material guidance regarding the issues before us. Generally, "[o]pinions of the Attorney General, while not binding, are entitled to great weight." (*Napa Valley Educators' Assn. v. Napa Valley Unified School Dist.* (1987) 194 Cal.App.3d 243, 399.) That is because an Attorney General

---

[5] The trial court took judicial notice of the 1984 report at the request of real parties -- which petitioner did not oppose -- and appears to have taken judicial notice of the 1957 opinion sua sponte. In sustaining real parties' demurrer to the section 17501 claims, the court placed special emphasis on the 1984 report as support for its conclusion that the statute is impermissibly vague.

7

opinion "'is not a mere "advisory" opinion . . . . ' [Citation.] Individuals affected by an Attorney General opinion 'must regard the authoritative opinion of the highest law enforcement officer of the state as having a definite impact' on their obligations under the subject laws." (*Natkin v. California Unemployment Ins. Appeals Bd.* (2013) 219 Cal.App.4th 997, 1006, quoting *Planned Parenthood Affiliates v. Van de Kamp* (1986) 181 Cal.App.3d 245, 263.)

In contrast, little weight may reasonably be assigned to the 1984 report, in which a committee established by the Attorney General proposed a replacement statute. That recommendation reflected testimony from individuals -- including prosecutors and retailers -- regarding difficulties they encountered in attempting to apply section 17501. Ordinarily, in resolving questions of law, courts do not defer to the opinions of such individuals -- including lawyers -- in determining how a statute is to be construed or applied. (*Woods v. Union Pacific Railroad Co.* (2008) 162 Cal.App.4th 571, 579; *WRI Opportunity Loans II, LLC v. Cooper* (2007) 154 Cal.App.4th 525, 532, fn. 3.) Furthermore, as the Legislature never amended the statute in response to the 1984 report, it is reasonable to infer that the Legislature did not view the committee as having identified defects in the statute warranting curative action. (See *Siskiyou County Farm Bureau v. Department of Fish & Wildlife* (2015) 237 Cal.App.4th 411, 431; *Ventura v. City of San Jose* (1984) 151 Cal.App.3d 1076, 1080.) Accordingly, although the 1984 report may suggest meritorious questions regarding the statute, it provides little guidance regarding the resolution of those questions and does not show they cannot be resolved.

C. *Free Speech Rights*

Our initial focus is on whether section 17501 implicates free speech rights under the First Amendment of the United States Constitution and the free speech provision of the California Constitution (Cal. Const., art. I, § 2, subd. (a)). Section 17501 consists of two paragraphs, the second of which contains a prohibition concerning advertisements. The first paragraph sets forth a standard relating to worth or value: "**For the purpose of this article the worth or value of anything advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer**

8

**is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.**" The second paragraph states: "**No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement**."[6]

Real parties contend the statute is subject to heightened scrutiny for constitutional vagueness because the prohibition restricts protected commercial speech, namely, the advertisement of truthful and nonmisleading former prices; they further contend the prohibition violates the First Amendment and the free speech provision of the California Constitution. Although the trial court did not decide whether the statute is an invalid regulation of free speech, the court ruled that the statute has an impact on protected commercial speech, and thus applied heightened scrutiny in evaluating it for vagueness. We therefore examine the extent to which the statute restricts free speech rights.

   1. *Protection of Commercial Speech*

"Under the First Amendment . . . , commercial speech is entitled to protection from governmental regulation [citations], although it is entitled to less protection than other constitutionally guaranteed speech. [Citations.] [¶] Commercial speech is 'expression related solely to the economic interests

---

[6]  In supplemental briefing, the parties directed our attention to a 1933 magazine article discussing the enactment of Assembly Bill 2384, which established the original version of section 17501. After characterizing the bill as a measure "designed to curb depression-born abuses," the article states that it "regulates comparative prices. With commodity prices shot to pieces and last year's bargains this year's extravagant memories, unscrupulous merchants have taken quick and unfair advantage. They advertise either wholly fictitious values, slashing them to prices that are actually merely current market prices, or else they compare present prices with figures that prevailed in 1929, carefully concealing the vintage of the higher price." (Gerald J. O'Gara, *The legislature goes "new deal"* (July 1933) Western Advertising, p. 20.)

of the speaker and its audience' [citation] and 'does no more than propose a commercial transaction . . . .' [Citation.] To that end, it serves the economic interests of the speaker, while assisting consumers and furthering the societal interest in the free flow of commercial information. [Citation.]" (*Bronco Wine Co. v. Jolly* (2005) 129 Cal.App.4th 988, 1003-1004, fn. omitted (*Bronco Wine*).)  Generally, commercial speech that is false or "inherently misleading" is not protected under the First Amendment.  (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 954 (*Kasky*).)

Here, the prohibition in section 17501 is directed at commercial speech, and relates to the content of advertising.  Under the First Amendment, the validity of a content-based restriction of commercial speech is subject to the multi-stage test set forth in *Central Hudson*, in which the court stated:  "At the outset, we must determine whether the expression is protected by the First Amendment.  For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading.  Next, we ask whether the asserted governmental interest is substantial.  If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." (*Central Hudson*, *supra*, 447 U.S. at p. 566.)

The free speech provision of the California Constitution also protects truthful and nonmisleading commercial advertising while permitting the imposition of sanctions for misleading commercial advertising. (*Kasky*, *supra*, 27 Cal.4th at p. 959.)  Absent exceptional circumstances, the protection afforded commercial speech under the free speech provision is at least as broad as the protection provided by the First Amendment.  (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 490-497.)  In construing the free speech provision, California courts have usually drawn the boundaries between noncommercial speech and commercial speech, and between protected and nonprotected commercial speech, with an eye to the analogous boundaries under the First Amendment.  (*Kasky*, *supra*, 27 Cal.4th at pp. 959, 969-970; see *Beeman v. Anthem Prescription Management, LLC* (2013) 58 Cal.4th 329, 341 (*Beeman*); *People v. Superior Court (Olson)* (1979) 96 Cal.App.3d 181, 192-195 (*Olson*).)  In *Olson*, the appellate court examined

section 17500, the key provision of the FAL which -- as discussed further below (see p. C.2., *post*), prohibits misleading or deceptive advertising, even if true -- and concluded that section 17500 bars only commercial speech unprotected under the First Amendment and the free speech provision of the state Constitution. (*Olson, supra*, at p. 195; see also *Keimer v. Buena Vista Books, Inc.* (1999) 75 Cal.App.4th 1220, 1230, fn. 10 (*Keimer*).)

Here, the key question is whether section 17501 regulates unprotected commercial speech. Generally, "[w]ith regard to misleading commercial speech, the United States Supreme Court has drawn a distinction between, on the one hand, speech that is actually or inherently misleading, and, on the other hand, speech that is only potentially misleading. Actually or inherently misleading commercial speech is treated the same as false commercial speech, which the state may prohibit entirely. [Citations.] By comparison, '[s]tates may not completely ban potentially misleading speech if narrower limitations can ensure that the information is presented in a nonmisleading manner.' [Citations.]" (*Kasky, supra*, 27 Cal.4th at p. 954.) The distinguishing mark of unprotected commercial speech is that it is "'more likely to deceive the public than to inform it.'" (*Bronco Wine, supra*, 129 Cal.App.4th at p. 1004, quoting *Central Hudson, supra,* 447 U.S. at p. 563, italics omitted.)

2. *Analysis*

The crux of real parties' "free speech" contention is that section 17501 restricts protected commercial speech because it "bans vast amounts of truthful speech about former prices." Petitioner counters that the statute, properly construed, applies only to false, misleading, or deceptive advertising of former prices. As explained below, we conclude that by its plain terms, the statute forbids certain common forms of truthful price advertising -- and thus restricts significant amounts of protected commercial speech. As further explained, however, on the limited record before us, real parties' "free speech" constitutional challenge fails on demurrer.

a. *Section 17501*

As real parties' contentions require us to interpret the prohibition contained in section 17501, we begin by examining the statute and its provenance. Section 17501 is one of three provisions enacted in 1941 as the

11

original components of Article 1 of Chapter 1, Division 7, Part 3 of the Business and Professions Code, which sets forth the FAL's primary prohibitions against false and misleading advertising. (Stats. 1941, ch. 63, § 1, pp. 727-728.) The three provisions -- sections 17500, 17501, and 17502 of the Business and Professions Code -- were derived from a single predecessor statute, former Penal Code section 654a. (See *People ex rel. Mosk v. National Research Co. of Cal.* (1962) 201 Cal.App.2d 765, 769, fn.1.)

Of the three provisions, the most prominent is section 17500, which "is the major California legislation designed to protect consumers from false or deceptive advertising." (*Olson*, *supra*, 96 Cal.App.3d at p. 190.) Section 17500 makes it "**unlawful for any person . . . with intent directly or indirectly to dispose of real or personal property or to perform services . . . or to induce the public to enter into any obligation relating thereto, to make or disseminate . . . before the public in this state, . . . in any newspaper or other publication . . . or in any other manner or means whatever . . . any statement, concerning that real or personal property or those services . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading**." The prohibition in section 17500 is broad in scope, as it encompasses "'not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'" (*Kasky*, *supra*, 27 Cal.4th at p. 951, quoting *Leoni v. State Bar* (1985) 39 Cal.3d 609, 626).) Under section 17500, such conduct is a misdemeanor; additionally, an action for violation of section 17500 or other provisions of the FAL may be brought either by a public prosecutor or by other persons with standing, and the remedies available include restitution and injunctive relief (§ 17535).

Sections 17501 and 17502, by their plain language, enhance or supplement section 17500. Section 17501 sets forth a specific prohibition not found in section 17500. Similarly, section 17502 establishes an immunity

from liability for entities that publish "an advertisement in good faith[] without knowledge of its false, deceptive, or misleading character."[7]

The conclusion that Business and Professions Code section 17501 was intended to extend beyond section 17500 derives additional support from their history. In 1915, the Legislature enacted a version of former Penal Code section 654a that contained two components, viz., the predecessor of the current version of Business and Professions Code section 17500 and the predecessor of the current version of section 17502. The first component was based on the so-called "Printers' Ink Model Statute," which was drafted in 1911 at the request of the Printers' Ink advertising journal, and promoted by that journal as a basis for legislation.[8] (*Olson, supra,* 96 Cal.App.3d at p. 190 & fn. 7; Note, *The Regulation of Advertising* (1956) 56 Colum.L.Rev. 1019, 1058-1059.) The second component constituted the final portion of the 1915 version of former Penal Code section 654a. In 1933, the Legislature amended former Penal Code section 654a by inserting the predecessor of the current version of Business and Professions Code section 17501 between the initial two components of the statute.[9] The structure of former Penal Code section

---

[7]     Section 17502 states: "This article does not apply to any visual or sound radio broadcasting station, to any Internet service provider or commercial online service, or to any publisher of a newspaper, magazine, or other publication, who broadcasts or publishes, including over the Internet, an advertisement in good faith, without knowledge of its false, deceptive, or misleading character."

[8]     The Printers' Ink Model Statute was eventually adopted in many states, either in its original form or with modifications. (*Olson, supra,* 96 Cal.App.3d at p. 190, fn. 7.)

[9]     Following the 1933 amendment, former Penal Code section 654a provided:

"Any person . . . who, with intent to sell . . . real or personal property . . . or to induce the public . . . to enter into any obligation relating thereto . . . shall make . . . in any . . . advertising medium . . . or by means of any . . . advertising device, . . . an advertisement . . . which [] shall contain

13

654a thus manifested the Legislature's intent to strengthen that statute by adding the predecessor of Business and Professions Code section 17501.

---

any statement . . . concerning such real or personal property . . . which . . . is false or untrue, . . . or which is deceptive and misleading, and which is known, or which by the exercise or reasonable care should be known, to be false or untrue, deceptive or misleading, by the person . . . circulating or placing before the public said advertisement, shall guilty of a misdemeanor.

"For the purpose of this section, the worth or value of anything advertised shall be taken to be the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.

"No price shall be advertised as a former price of any advertised thing, unless said former price was the prevailing market price as above defined within three months next immediately preceding the publication of said advertisement or unless the date when said former price prevailed shall be clearly, exactly and conspicuously stated in the said advertisement.

"Provided, however, that this act shall not apply to any publisher of a newspaper, magazine, or other publication, who publishes said advertisement in good faith, without knowledge of its false, deceptive, or misleading character."

*b. Scope of Prohibition in Section 17501*

The key question concerns the extent to which section 17501 implicates free speech rights. Our inquiry into the scope of the prohibition necessarily begins with its express terms, as a statute's language "is generally the most reliable indicator of legislative intent." (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715.) The prohibition states: "**No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement**."

Because the prohibition must be construed within section 17501, viewed as a whole, we examine it in light of the preceding paragraph, which focuses on "worth" and "value": "**For the purpose of this article the worth or value of anything advertised is the prevailing market price . . . at the time of publication of such advertisement in the locality wherein the advertisement is published**." Generally, in a commercial setting, the value or worth of an item is its market value, which may be shown by the market price. (*Bagdasarian v. Gragnon* (1948) 31 Cal.2d 744, 753; *Yellen v. Fidelity & Casualty Co.* (1931) 115 Cal.App. 434, 441)[10] In

---

[10] As our Supreme Court has explained, "'value,' in connection with legal problems, ordinarily means market value." (*Bagdasarian v. Gragnon, supra,* 31 Cal.2d at p. 753; *Bullock's, Inc. v. Security-First Nat'l. Bank of Los Angeles* (1958) 160 Cal.App.2d 277, 282 ["'When applied without qualification to property of any description, ["value"] necessarily means the price it will command in the market,'" quoting Bouv., Law Dict., Rawle's Third Revision, p. 3387]; see *Joint Highway Dist. v. Ocean S. R. Co.* (1933) 128 Cal.App. 743, 754.) The term "worth" is usually attributed the same meaning. (*Yellen v. Fidelity & Casualty Co., supra,* 115 Cal.App. at p. 441; Black's Law Dict. (10th ed. 2014) p. 1844, col. 2 ["worth *n.* . . . 1. The monetary value of a thing"].) Ordinarily, value or worth, so understood, is not established by a single sale, but "'by the haggling of the market.'" (*Guild Wineries & Distilleries v. County of Fresno* (1975) 51 Cal.App.3d 182, 187, quoting *Janss*

15

turn, the term "market price" ordinarily refers to the prevailing price at which the item is offered by sellers in the pertinent market. (Black's Law Dict. (10th ed. 2009) p. 1381, col. 1 ["market price" . . . . The prevailing price at which something is sold in a specific market. See *at-the-market price*"; "at-the-market price. The price at which a good or service is offered, or will fetch, within a specified area: esp., the retail price that store owners in the same vicinity generally charge for a particular thing or its equivalent."].)

Viewed in context, the prohibition, by its plain language, forbids *any* advertisement of the former price of an "advertised thing" that does not express the market price information regarding former worth or value, as specified in the statute. Simply put, the prohibition bans any advertised claim regarding the former price of an item (1) unless the advertised former price was "the prevailing market price as [] defined [in section 17501] within the three months next immediately preceding the publication of the advertisement" or (2) unless the advertised former price was the prevailing market price -- as defined in section 17501 -- on a clearly specified date. So understood, the prohibition imposes standardized market-based meanings on permissible former price claims, and proscribes all other former price claims -- including discount advertising that conveys the seller's *own* former price for an item, unless that advertised former price coincides with one of the specified two market prices.[11]

---

*Corp. v. Board of Equalization of Blaine County* (1970) 478 P.2d 878, 881.)

[11]    In supplemental briefing, petitioner contends the prohibition, as interpreted above, "contains no 'ban' on truthful speech," and "expressly allows for retailers to advertise any truthful former price, so long as the retailer also identifies the date when the price was offered." The crux of petitioner's argument is that in the clause, "unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement," the term "prevailed" refers to the retailer's *own* price on the specified date, rather than the prevailing market price for the date. We reject that interpretation, as it would require us to impose a new meaning on the term "prevail" different from its meaning in the other portions of the statute. By its plain language, the prohibition clearly bans all truthful former price claims regarding the retailer's own prices that do not coincide

16

Because the meaning of the elements of the prohibition discussed above is clear, we need not look beyond the statutory language to consider the statute's legislative history or other factors. (*Jackpot Harvesting Co., Inc. v. Superior Court* (2018) 26 Cal.App.5th 125, 141.) Moreover, nothing before us supports an alternative interpretation of the prohibition. Because the prohibition was enacted as a provision of former Penal Code section 654a, it is reasonable to infer that the Legislature's intent was to enhance the then-existing protections against false, deceptive and misleading advertisements contained in that statute. As interpreted above, the prohibition does, in fact, ban certain forms of false, deceptive, and misleading advertisements regarding former prices -- albeit at the cost of banning a considerable amount of truthful and nonmisleading advertising regarding former prices, including a good deal of discount advertising by individual retailers regarding their own former prices. For example, if a retailer offered widely sold brands of Halloween costumes, the prohibition would preclude the retailer from advertising, "All Halloween costumes 50 percent off our former prices," on the day after Halloween, unless those prices coincided with one of the two requisite market prices.

Our interpretation of the prohibition finds support in the 1957 Attorney General opinion and *Spann v. J.C. Penney Corp.* (C.D. Cal. 2015) 307 F.R.D. 508 (*Spann*). The Attorney General stated that sections 17500 and 17501 have application "in the so-called 'comparative advertising' field," which encompasses advertisements of an item's value or worth, and advertisements of an item's former selling price. (30 Ops.Cal.Atty.Gen. 127, 129 (1957).) The Attorney General further concluded that under the statutes, both types of advertisement "must coincide with the same standard, the 'prevailing market price,' which means the actual selling price of the article in the open market." (*Ibid.*)

As discussed further below (see pt.D.3.b.i., *post*), in *Spann*, the plaintiff asserted a putative class action against real party J.C. Penney, asserting claims under section 17501, based on allegations resembling those relevant here. (*Spann, supra*, 307 F.R.D. at pp. 512-513.) The plaintiff requested an

with the specified prevailing market prices, regardless of whether the retailer specifies the date on which its claimed former prices obtained.

17

order certifying the class, which the trial court granted. (*Id*. at p. 533.) In so ruling, the court concluded that according to the "clear language" of section 17501, "when a retailer advertises a 'former' or 'original' price and compares it with a sale price, that 'former' or 'original' price must refer to the prevailing market price of the item." (*Id*. at p. 526.)

Petitioner insists the legislative purpose behind section 17501 was "not [to] limit or penalize protected or truthful speech." We recognize our obligation, "if possible, to construe [the] statute in a fashion that renders it constitutional" (*In re M.S.* (1995) 10 Cal.4th 698, 710), and that in extraordinary circumstances, a court may disregard statutory language that conflicts with manifest legislative intent (*Times Mirror Co. v. Superior Court* (1991) 53 Cal.3d 1325, 1334, fn.7; *Kramer v. Intuit Inc.* (2004) 121 Cal.App.4th 574, 578-581). However, those principles are inapplicable here, as there is no way to confine the prohibition to nonprotected commercial speech without rewriting it. (*Vasquez v. State of California* (2008) 45 Cal.4th 243, 253 ["We may not rewrite the statute to conform to an assumed intention that does not appear in its language"]; *City of Sacramento v. Public Employees' Retirement System* (1994) 22 Cal.App.4th 786, 793-797.)

Nor does anything before us suggest the existence of a legislative intent to focus section 17501 exclusively on false, misleading, and deceptive commercial speech. As explained above, the prohibition operates by affirmatively defining two limited classes of permissible former price claims while banning all other such claims.[12] In order to construe the prohibition as targeting only nonprotected commercial speech, it would be necessary to imply new language qualifying the prohibition so that it does not ban protected commercial speech. Given the prohibition's grammatical structure, it is impossible to impose that qualification simply by inserting the phrase, "false, misleading, or deceptive" somewhere in the prohibition. Petitioner has

---

[12]  We note that in 1933, when the predecessor of section 17501 was enacted, the precise extent to which commercial speech enjoyed constitutional protection was uncertain, as there was relatively little litigation regarding that issue. (See *Gerawan Farming, Inc. v. Lyons, supra,* 24 Cal.4th 468 at pp. 487, 494-497.)

identified no appropriate qualifying language, and has submitted no evidence that the Legislature inadvertently omitted language of that type.

Although the complaints suggest what appears to be an alternative interpretation of section 17501, that interpretation neither complies with the canons of statutory interpretation nor restricts the prohibition to nonprotected commercial speech. Each complaint alleges that the relevant "market" is the pertinent real party's "own offering of the items." To the extent those allegations are intended to state a general interpretation of section 17501, they suggest that the statutory term "prevailing market price" means the price in a single "market," understood as the business operation of the retailer making the price claim. So construed, the prohibition would ban any advertised former price claim unless it (1) was the retailer's own "prevailing" price "within three months next immediately preceding the publication of the advertisement" or (2) was the retailer's own "prevailing" price on a specified date.

The proposed interpretation is untenable. First, it disregards the common meaning of the term "prevailing market price," and would render a portion of the standard surplusage. As noted above, the prohibition refers to the definition of an advertised item's prevailing market price stated in the standard, that is, "the prevailing market price . . . at the time of publication of such advertisement *in the locality wherein the advertisement is published.* (§ 17501, italics added.) Accordingly, if the phrase "prevailing market price" generally meant the price set by the retailer responsible for the advertisement -- that is, the retailer's own price -- the italicized phrase would be superfluous to the definition of "prevailing market price." Indeed, had the Legislature intended the phrase to refer to the price offered by the business responsible for the advertisement, it could easily have done so, and omitted the use of the terms "market" and "prevailing market price."[13] (See *Goebel v.*

---

[13] In so concluding, we do not reject the possibility that under the statute, as properly construed, a retailer's own former price for a good may sometimes constitute the requisite former market price. As explained further below (see pt. D.3.b.i., *post*), that situation occurs when the good in question is an "in-house" item sold only by the retailer, as the retailer's price for such a good is necessarily the "prevailing" price at which it is sold.

19

*City of Santa Barbara* (2001) 92 Cal.App.4th 549, 559.)  Second, under petitioner's interpretation, the prohibition would not target only false and misleading commercial speech, as it would ban certain truthful claims by individual retailers, for example, claims regarding an item's former market value (as based on the prices offered by other sellers in the market) when that differed from the retailer's own former price.  In sum, we conclude that the prohibition, properly construed, bans a considerable amount of commercial speech protected under the First Amendment and the free speech provision of the California Constitution.[14]

   c. *Failure of Constitutional Challenge Based on Free Speech Rights on Demurrer*

 The remaining question is whether the prohibition, as interpreted above, is an invalid regulation of commercial speech.  Our focus is on whether there is an adequate justification for the prohibition.  (See *Gerawan Farming, Inc. v. Kawamura* (2004) 33 Cal.4th 1, 21-24; *City of Corona v. AMG Outdoor Advertising, Inc.* (2016) 244 Cal.App.4th 291, 306; *Baba v. Board of Supervisors* (2004) 124 Cal.App.4th 504, 518-520.)  Under the *Central Hudson* test, the prohibition is valid only if it is narrowly tailored to directly advance a substantial governmental interest.  (*Central Hudson*, *supra*, 447

---

[14] In a related contention, relying on *Zauderer v. Office of Disciplinary Counsel of Supreme Court* (1985) 471 U.S. 626 (*Zauderer*) and *Beeman*, *supra*, 58 Cal.4th 329, petitioner contends that section 17501 merely compels commercial speech, and thus is not subject to the *Central Hudson* test.  We disagree.  *Zauderer* and *Beeman* examined regulations that did not ban a general class of commercial speech, but merely compelled disclosures in specified circumstances.  In *Zauderer*, the pertinent regulation was an Ohio State Bar rule requiring attorneys advertising contingency-fee rates to include information regarding the payment of court costs (*Zauderer*, *supra*, 471 U.S. at p. 663); in *Beeman*, the pertinent regulation was a statute requiring prescription drug insurance claims processors to provide certain cost information to consumers (*Beeman*, *supra*, at p. 336).  Each court characterized the regulation as facilitating, rather than impeding, the flow of information.  (*Zauderer*, *supra*, 471 U.S. at p. 650; *Beeman*, *supra*, at p. 356.)  In contrast, the prohibition in section 17501 bans an entire class of commercial speech, with two narrow exceptions.

20

U.S. at pp. 567-570.) Generally, the test cannot be applied "in the abstract," or on the basis of speculation or conjecture. (*Gerawan Farming, Inc. v. Kawamura*, *supra*, at p. 22.) As our Supreme Court has explained, under the *Central Hudson* test, establishing the validity of a statute regulating protected commercial speech requires a factual showing regarding the Legislature's actual grounds for enacting the statute and its efficacy in achieving the legislative objective. (*Gerawan Farming, Inc. v. Kawamura*, *supra*, 33 Cal.4th at pp. 21-24.) In addition to establishing that the statute addresses a governmental interest that is, "'in fact,'" substantial, the record must disclose "substantial evidence" that the statute directly advances the interest in question and is narrowly tailored to achieve that objective. (*Id*. at p. 23.)

Although the proponent of a statute restricting protected commercial speech ordinarily bears the burden of justifying it (*Edenfield v. Fane* (1993) 507 U.S. 761, 770), that rule is inapplicable here, as real parties assert their challenge on demurrer. Because the challenge depends on facts extrinsic to those necessary to state petitioner's section 17501 claims, it amounts to an affirmative defense.[15] However, "[a] demurrer based on an affirmative defense cannot properly be sustained where the action *might* be barred by the defense, but is not *necessarily* barred." (*CrossTalk Productions, Inc. v. Jacobson* (1998) 65 Cal.App.4th 631, 635.) Accordingly, real parties' challenge fails unless it is conclusively demonstrated by the facts pleaded in the complaints or subject to judicial notice. (See *Gold v. Los Angeles Democratic League* (1975) 49 Cal.App.3d 365, 376; *Keimer*, *supra*, 75 Cal.App.4th at pp. 1229-1230.)

Here, the meager record permits no evaluation of the validity of the section 17501 under the *Central Hudson* test. In view of the broad sweep of the prohibition contained in the statute, we question whether an adequate justification exists for the prohibition. Nonetheless, the record before us does not establish that the requisite justification does not exist. For that reason,

---

[15] Generally, an affirmative defense relies on a fact that is independent of the factual allegations essential for the plaintiff's claim. (*Bevill v. Zoura* (1994) 27 Cal.App.4th 694, 698.)

real parties "free speech" challenge necessarily fails on demurrer. (*Gerawan Farming, Inc. v. Kawamura, supra*, 33 Cal.4th at pp. 21-24.)[16]

D. *Vagueness*

We turn to real parties' contention that section 17501 is void for vagueness under the due process clauses of the United States and California Constitution. For the reasons discussed below, we reject the contention.

1. *Governing Principles*

"It is a well-settled rule that 'a statute which either forbids or requires the doing of an act in terms so vague that [people] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'" (*Connor v. First Student, Inc.* (2018) 5 Cal.5th 1026, 1034, quoting *Connally v. General Const. Co.* (1926) 269 U.S. 385, 391 (*Connally*).) Statutes "that are not clear as to the regulated conduct are void for three reasons: (1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of the laws based on arbitrary and discriminatory enforcement by government officers; and (3) to avoid any chilling effect on the exercise of First Amendment freedoms. [Citation.]" (*Concerned Dog Owners of California v. City of Los Angeles* (2011) 194 Cal.App.4th 1219, 1231 (*Concerned Dog Owners*).)

"As to the first two applications, the Fourteenth Amendment due process guarantee against vagueness requires that laws provide adequate warning to people of ordinary intelligence of the conduct that is prohibited, and standards to protect against arbitrary and discriminatory enforcement. [Citation.] . . . [¶] The third application of constitutional vagueness applies when [the statute] 'clearly implicates free speech rights.'" (*Concerned Dog*

---

[16] We note that in supplemental briefing, petitioner contends the statute can be shown to be valid under *Central Hudson* test, and has directed our attention to evidence relevant to one of its prongs, namely, whether the statute serves a substantial governmental interest. Real parties' "free speech" challenge to the statute thus cannot be resolved on demurrer, as doing so would deny petitioner an opportunity to make a full evidentiary showing regarding the application of the *Central Hudson* test. (See *Tobe, supra*, 9 Cal.4th at p. 1092.)

*Owners*, *supra*, 194 Cal.App.4th at p. 1231.)  Generally, when a statute regulates protected speech, it is subject to heightened scrutiny for clarity. (*Holder, supra,* 561 U.S. at p. 18; *Concerned Dog Owners*, *supra*, at pp. 1231-1232.)

### 2. *Standards Applicable to Real Parties' Challenges*

Here, real parties assert facial and as-applied challenges to section 17501, and the trial court, in concluding that the latter was successful, subjected the statute to heightened scrutiny due to its potential impact on free speech.  At the threshold of our inquiry, we must resolve two issues regarding our standards for evaluating the challenges, namely, whether real parties can assert a successful facial challenge if section 17501 clearly applies to some of their alleged misconduct, and whether their challenges require heightened scrutiny.

### a. *Propriety of Facial Challenge*

The parties dispute whether real parties' facial challenge fails if the statute clearly applies to some of their alleged misconduct.  Relying primarily on *Hoffman Estates*, *supra*, 455 U.S. 489, petitioner contends that real parties cannot successfully challenge the statute as void for vagueness if some of their alleged conduct is clearly subject to the statute.  Real parties maintain that under *Johnson*, *supra*, 135 S.Ct. 2551, they are permitted to assert a facial challenge even if their conduct clearly falls within the ambit of section 17501.  As explained below, we agree with petitioner.

### i. *Facial Vagueness Challenges Before* Johnson

We begin by setting forth the key rules regarding facial vagueness challenges prior to *Johnson.*  When the challenged statute did not implicate free speech rights, the standard for a successful facial challenge was high: the party asserting the challenge was obliged to show that the statute was "impermissibly vague in all of its applications." (*Hoffman Estates*, *supra*, 455 U.S. at p. 495; *People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1116 (*Gallo*).)  Furthermore, the court's evaluation of a facial challenge inquired at the threshold whether the statute clearly applied to the challenger's conduct. (*Hoffman Estates*, *supra*, at p. 495 ["A court should . . . examine the complainant's conduct before analyzing other hypothetical applications of the law"]; *Maynard v. Cartwright* (1988) 486 U.S. 356, 361 ["Vagueness

23

challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis."].)

Under this "as-applied inquiry first" rule, the facial challenge failed if the statute clearly applied to some or all of the challenger's conduct. (*Hoffman Estates*, *supra*, 455 U.S. at p. 495 ["A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others"]; *Tobe*, *supra*, 9 Cal.4th at p. 1095 ["If the statute clearly applies to a criminal defendant's conduct, the defendant may not challenge it on grounds of vagueness"]; *Allen v. Sacramento* (2015) 234 Cal.App.4th 41, 55 [facial challenge to ordinance unsuccessful where ordinance clearly applied to challengers].) Although criminal statutes received greater scrutiny than civil statutes, the "as-applied" determination did not hinge on whether the statute's application was perfectly clear, even in the case of criminal statutes (*Hoffman Estates*, *supra*, 455 U.S. at p. 502); it was sufficient that the bulk of the alleged conduct "readily f[e]ll" within the scope of the statute (see *Holder*, *supra*, 561 U.S. at p. 21). Additionally, the challenger was not permitted to defeat the determination by raising abstract or hypothetical questions regarding the statute's application in situations remote from the challenger's concrete circumstances. (*Id*. at pp. 21-25.)

The principal decision regarding these rules was *Hoffman Estates.* There, a merchant asserted a facial vagueness challenge to a city ordinance requiring retailers to secure a license in order to sell items "'designed or marketed for use'" with illegal cannabis or drugs. (*Hoffman Estates, supra,* 455 U.S. at p. 491.) After determining that the statute implicated no cognizable free speech interests, the court examined it under the "as-applied inquiry first" rule. (*Id*. at pp. 495-504.) Upon finding the statute clearly applied to at least some of the merchant's conduct, the court concluded that the facial vagueness challenge failed, notwithstanding the existence of ambiguities relating to the merchant's conduct. (*Ibid*.)

Here, the parties dispute whether *Johnson* abrogated the use of the "as-applied inquiry first" rule in the context of real parties' facial vagueness challenge to section 17501, which restricts protected commercial speech. Prior to *Johnson*, the fact that the challenged statute restricted protected

commercial speech did not displace the application of the "as-applied inquiry first" rule to a facial vagueness challenge. (*Harell v. Florida Bar* (11th Cir. 2010) 608 F.3d 1241, 1253-1257 [relying on rule to reject facial vagueness challenges to bar regulations restricting attorney advertising before examining issues relating to validity of regulations under *Central Hudson* test]; *Hunt v. City of Los Angeles* (9th Cir. 2011) 638 F.3d 703, 710, 714-718 [relying on rule to reject facial vagueness challenge to statute before determining it to be valid regulation of commercial speech under *Central Hudson* test]; *NAACP v. City of Philadelphia* (E.D.Penn. 2014) 39 F.Supp.3d 611, 614-616 [relying on rule to reject facial vagueness challenge to airport billboard regulations before determining regulations were valid under First Amendment]; see *City of Vallejo v. Adult Books* (1985) 167 Cal.App.3d 1169, 1173-1177 [relying on rule to reject vagueness challenge to zoning ordinance before determining ordinance did not contravene First Amendment].) Rather -- as discussed further below (see pt.D.2.b., *post*) -- that fact potentially required the employment of a higher standard of scrutiny in determining whether the statute clearly applied to the challenger's conduct. (*Holder*, *supra*, 561 U.S. at pp. 20-25; see *Hoffman Estates*, *supra*, 455 U.S. at p. 498.)

ii.     *Continuing Vitality of "As-Applied Inquiry First" Rule*

For the reasons discussed below, we conclude that *Johnson* did not abolish the use of the "as-applied inquiry first" rule here. In *Johnson*, a criminal defendant asserted a vagueness challenge to the "residual clause" of the Armed Career Criminal Act, (18 U.S.C. § 924(e)(2)(B)), under which a defendant was subject to an increased sentence where the offense "involve[d] conduct that present[ed] a serious potential risk of physical injury to another." (*Johnson, supra,* 135 S.Ct. at p. 2555.) Under prior case law establishing a categorical approach to deciding whether an offense met the statutory definition, a court was required to assess risk based on "a judicially imagined 'ordinary case' of a crime, not to real-world facts" relating to a particular defendant's own conduct. (*Id.* at p. 2557.) Without analyzing whether the residual clause clearly applied to the specific crime of the defendant, the court concluded the clause was unconstitutionally vague. (*Id.* at pp. 2560-2561.) Pointing to persistent difficulties courts had encountered

25

in attempting to apply the test for risk, the court found the test effectively unworkable and the residual clause fatally vague.

While *Johnson* addressed the facial challenge to the statute without first attempting to apply it to the defendant's conduct, the high court noted that some of its prior holdings contradicted the notion that "a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." (*Johnson, supra,* 135 S.Ct. at p. 2561.) The court noted it had previously struck down criminal statutes whose language was so plainly incapable of satisfactory definition that the court deemed it unnecessary to address whether the challenger's conduct arguably fell within it. (*Ibid.*) In *United States v. L. Cohen Grocery Co.* (1921) 255 U.S. 81, 91, the court invalidated a criminal statute prohibiting grocers from charging an "unjust or unreasonable rate" for a commodity; in *Coates v. Cincinnati* (1971) 402 U.S. 611, 614, the court struck down a criminal statute prohibiting people on sidewalks from engaging in "annoying" conduct.

To the extent *Johnson* declined to look first at the defendant's conduct, it created uncertainty regarding the high standard for a successful facial challenge. Nevertheless, it neither expressly overruled *Hoffman Estates* nor even mentioned it. As one circuit court observed, the unifying tenet of the prior cases on which the court relied was that a criminal statute that "'simply has no core' and lacks 'any ascertainable standard for inclusion and exclusion'" is impermissibly vague, regardless of the facts of the particular case. (*United States v. Cook* (7th Cir. 2019) 914 F.3d 545, 550; see *United States v. Jones* (7th Cir. 2012) 689 F.3d 696, 703, abrogated on other grounds in *Johnson, supra*, 135 S.Ct. at p. 2563.) Similarly, *Johnson* itself involved an unusual statute whose application had been demonstrably problematic. (*Johnson, supra,* 135 S.Ct. at p. 2560 ["The clause has 'created numerous splits among the lower federal courts,' where it has proved 'nearly impossible to apply consistently,'" quoting *Chambers v. United States* (2009) 555 U.S. 122, 133 (con. opn. of Alito, J.), abrogated on other grounds in *Johnson*, *supra*, 135 S.Ct. at p. 2562.) As the court observed, "this Court's repeated attempts and repeated failures to craft a principled and objective standard out of the residual clause confirm its hopeless indeterminacy." (*Johnson, supra,* 135 S.Ct. at p. 2558.)

In our view, *Johnson* did not put an end to the "as-applied inquiry first" rule. Rather, the decision appeared to involve an exceptional statute in which the key defect could be established without examining the statute as applied to the challenger's circumstances. Indeed, after *Johnson,* both federal and California courts have continued to rely on the "as-applied inquiry first" rule. (*Cook, supra,* 914 F.3d at pp. 549-555 [applying rule in rejecting facial vagueness challenge to criminal statute]; *Doe v. Valencia College* (11th Cir. 2018) 903 F.3d 1220, 1233 [relying on rule in rejecting facial vagueness challenge to school rule regulating unprotected student speech]; *Ledezma-Cosimo v. Sessions* (9th Cir. 2017) 857 F.3d 1042, 1047 [applying rule in rejecting facial vagueness challenge to deportation statute]; *United States v. Bramer* (8th Cir. 2016) 832 F.3d 908, 909 [applying rule in rejecting facial vagueness challenge to criminal statute]; *Arigoni Enterprises, LLC v. Town of Durham* (2d Cir. 2015) 629 Fed.Appx. 23, 25 [applying rule in rejecting facial vagueness challenge to zoning ordinance]; *In re Gary H.* (2016) 244 Cal.App.4th 1463, 1476 [applying rule in rejecting facial vagueness challenge to criminal statute]; but cf. *Henry v. Spearman* (9th Cir. 2018) 899 F.3d 703, 708 [stating precedent did not foreclose possibility that *Johnson* nullified rule, without deciding issue].) Those decisions include at least one invoking the rule in the context of a statute restricting commercial speech. (*Contest Promotions, LLC v. City and County of San Francisco* (9th Cir. 2017) 704 Fed.Appx. 665, 668 [applying rule in rejecting facial vagueness challenge to statute otherwise determined to be valid regulation of commercial speech under *Central Hudson* test].)

The remaining issue is whether we should follow the "as-applied inquiry first" rule. Real parties contend, in effect, that the exceptional circumstances in *Johnson* are also present here, as their facial and as-applied challenges rely on the same claim, namely, that the statute is entirely meaningless. Pointing to the 1984 committee report, they assert that the statute's key terms "individually and in combination create an incomprehensible statute that is void for vagueness on its face." They offer the same contention in challenging the statute for vagueness as applied, arguing that it "contains a series of terms that have no defined, predictable, understandable application either singly or in combination. Thus, even if the

27

allegations in the . . . complaints are accepted as true . . . , the conduct therein described is not 'clearly proscribed' by [s]ection 17501 -- because [s]ection 17501 'clearly proscribes' nothing." (Italics omitted.)

We are not persuaded. As our Supreme Court has explained, an overarching principle in evaluating vagueness challenges is that "abstract legal commands must be applied in a specific *context*. A contextual application of otherwise unqualified legal language may supply the clue to a law's meaning, giving facially standardless language a constitutionally sufficient concreteness." (*Gallo, supra*, 14 Cal.4th at p. 1116.) In view of that principle, real parties' contentions cannot be resolved adequately without examining section 17501 in the context of the misconduct alleged against them. In our analysis below (see pt.D.3., *post*), we therefore follow the "as-applied inquiry first" rule, with due attention to whether the statute's application to the facts alleged in the complaint establishes that it is not fatally vague.[17]

### b. *Heightened Scrutiny*

The remaining question before conducting that analysis is whether, in view of our conclusion that section 17501 restricts protected commercial speech, a higher standard of clarity is required in our application of the "as-

---

[17] After oral argument, real parties directed our attention to *Bucklew v. Precythe* (2019) 139 S.Ct. 1112. [2019 U.S. LEXIS 2477], which discussed as-applied and facial challenges under the Eighth Amendment of the United States Constitution. In holding that a person sentenced to death must show a less painful alternative method of execution, regardless of whether the person asserts an as-applied or a facial challenge, the court stated that "classifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding 'breadth of the remedy,' but it does not speak at all to the substantive rule of law necessary to establish a constitutional violation." (*Id*. at p. *31; see also *id*. at pp. *26-*34.) Our decision comports with that principle, as we conclude that absent the extraordinary circumstances present in *Johnson*, as-applied and facial vagueness challenges alike fail if the relevant statute clearly applies to the challenger's conduct.

28

applied inquiry first" rule. In the context of a facial or as-applied vagueness challenge to a statute restricting protected speech, heighted scrutiny may be required in evaluating whether the statute clearly applies to the challenger's conduct. (See *Hoffman Estates*, *supra*, 455 U.S. at p. 498; *Holder*, *supra*, 561 U.S. at pp. 20-25.)

The nature of the heightened standard of clarity was discussed in *Holder*. There, legal rights groups and individuals asserted constitutional challenges to a federal statute making it a crime to "knowingly provid[e] material support or resources" -- including a "'service'" such as "'training'" or "'expert advice'" -- "'to a foreign terrorist organization.'" (*Holder*, *supra*, 561 U.S. at p. 1; 18 U.S.C. §§ 2339A(b)(1), 2339B.) The plaintiffs alleged they wished to support the humanitarian and political activities of two designated terrorist groups, but refrained from doing so for fear of prosecution under the statute. (*Id*. at p. 10.) They argued the statute prohibited them from educating the groups on how to use specific legal means to achieve peaceful political goals. (*Id*. at p. 14.) The plaintiffs challenged the statute on the grounds that it contravened the First Amendment and was void for vagueness as applied to them. (*Ibid*.) The Ninth Circuit concluded that regardless of whether the ban clearly applied to the plaintiffs, it was void for vagueness as applied to them because it appeared to restrict free speech. (*Id*. at p. 19.)

Relying on *Hoffman Estates*, the United States Supreme Court rejected the Ninth Circuit's ruling, stating: "[T]he Court of Appeals contravened the rule that '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" (*Holder*, *supra*, 561 U.S. at p. 20, quoting *Hoffman Estates, supra*, 455 U.S. at p. 495.) The court further explained: "That rule makes no exception for conduct in the form of speech. [Citation.] Thus, even to the extent a heightened vagueness standard applies, a plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice. And he certainly cannot do so based on the speech of others. . . . [O]ur precedents make clear that a Fifth Amendment vagueness challenge does not turn on whether a law applies to a substantial amount of protected expression." (*Ibid*.) The high

court found that notwithstanding a heightened standard of scrutiny, the vagueness challenge failed, reasoning that "most" of plaintiffs' conduct "readily f[e]ll" within the scope of the statute, and the plaintiffs otherwise raised only hypothetical questions regarding the statute's application in situations remote from their concrete circumstances.  (*Id.* at p. 21.)

In view of *Holder*, when a regulation restricts protected speech, the application of the "as-applied inquiry first" rule may involve a higher standard of clarity in determining whether the challenger's own conduct falls under the statute.  Here, it is unclear that real parties' challenges trigger that standard, notwithstanding our conclusion that section 17501 restricts protected commercial speech.  Because the section 17501 claims are predicated on what is alleged to be real parties' false, misleading, or deceptive advertising, the claims do not encompass any protected commercial speech by real parties.[18]  Furthermore, due to the limited constitutional protection afforded commercial speech, real parties may not invoke the statute's impact on the protected commercial speech of other parties.  (*Hoffman Estates*, *supra*, 455 U.S. at pp. 496-500.)  Nonetheless, it is unnecessary to decide whether heightened scrutiny is mandated here, as we conclude that even under such a standard of clarity, real parties have

---

[18]     The trial court, in overruling real parties' demurrers to petitioners' other causes of action, concluded that the complaints' allegations stated causes of action for false, misleading, or deceptive advertising under section 17500.  Before us, real parties have not challenged that ruling.  Accordingly, for purposes of this writ proceeding, the allegedly false, misleading, or deceptive former price advertising must be viewed as unprotected commercial speech, as section 17500 targets such speech (*Olson*, *supra*, 96 Cal.App.3d at p. 195; *Keimer*, *supra*, 75 Cal.App.4th at p. 1230).  Because the section 17501 claims are directed at the same former price advertising, real parties may not contend that the prohibition in section 17501 is being applied to their protected speech.

identified no defects or ambiguities sufficient to deny them notice regarding the propriety of their alleged conduct.[19]

  3. *Analysis*

---

[19] Real parties have failed to establish any other tenable basis for heightened scrutiny of the statute.  They suggest that section 17501 is subject to the enhanced standard of clarity appropriate for criminal statutes because criminal penalties are potentially available for violations of section 17501 (§ 17534).  In *Ford Dealers Assn. v. Department of Motor Vehicles* (1982) 32 Cal.3d 347 (*Ford Dealers Assn.*), our Supreme Court rejected a contention closely resembling that asserted by real parties.  There, an association of automobile dealers challenged the validity of certain regulations relating to Vehicle Code section 11713, which bans the dissemination of the false or misleading statements to the public by licensed automobile dealers.  (*Id.* at pp. 354-356.)  In challenging the regulations as void for vagueness, the association contended heightened scrutiny was required because criminal penalties were available for violations of Vehicle Code section 11713.  (*Id.* at p. 366, fn. 12.)  The court declined to apply that standard, noting that the statute was a "remedial" statute -- that is, "designed to protect the public" -- and thus subject to liberal construction to effectuate its purposes, that potential criminal liability under the statute was not at issue in the particular case, and that "only the civil, administrative aspects of the statute [were] before the court."  (*Id.* at pp. 356, 367, fn. 12.)

The rationale in *Ford Dealers Assn.* applies here.  Like the statute at issue there, section 17501 is a remedial statute subject to liberal construction to effectuate the protection of consumers, and the instant complaints do not seek criminal penalties.  We therefore decline to subject the statute to the heightened standard of clarity appropriate for criminal statutes.

*Sessions v. Dimaya* (2018) ___ U.S. ___, ____ [138 S.Ct. 1204, 1213], upon which real parties rely, is distinguishable.  There, the United States Supreme Court applied heighted scrutiny to a civil statute authorizing the deportation of persons with criminal convictions, noting that it had long subjected such laws to enhanced scrutiny in view of the severity of deportation as a penalty.  That consideration is not pertinent here.

As explained below, we reject real parties' facial and as-applied vagueness challenges. Their facial challenge to section 17501 fails in its entirety because the statute clearly prohibits some of the misconduct alleged in the complaints; furthermore, the as-applied challenge relating to the remaining misconduct fails on demurrer for want of factual allegations sufficient to support the challenge.

Generally, "'[i]n considering whether a legislative proscription is sufficiently clear to satisfy the requirements of fair notice, "we look first to the language of the statute . . . ." [Citations.] . . . [Citation.] The Legislature's intent "as exhibited by the plain meaning of the actual words of the law," must be followed ""whatever may be thought of the wisdom, expediency, or policy of the act.""" [Citations.]' [Citations.]" (*Benson v. Kwikset Corp.* (2007) 152 Cal.App.4th 1254, 1269.) The standards for conduct in the statute may also be "fleshed out . . . by reference to any of the following sources: (1) long established or commonly accepted usage; (2) usage at common law; (3) judicial interpretations of the statutory language or of similar language; (4) legislative history or purpose." (*Sechrist v Municipal Court* (1976) 64 Cal.App.3d 737, 745; see *Ford Dealers Assn., supra,* 32 Cal.3d at pp. 365-369.)

At the outset, we note that the trial court, in accepting the as-applied challenge, directed its attention primarily to petitioner's legal conclusions regarding the application of section 17501, as alleged in the complaints. However, "we are not limited to [petitioner's] theor[ies] of recovery in testing the sufficiency of [the] complaint[s] [on] demurrer, but instead must determine if the factual allegations of the complaint[s] are adequate to state a cause of action under any legal theory." (*Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 103, italics omitted.) For that reason, in evaluating real parties' vagueness challenges, we look to the factual allegations in the complaints, rather than any legal conclusions they may contain.

a. *Allegations in Complaints*

The complaints assert that real parties offer goods for sale online at prices purportedly discounted from so-called "reference prices" that are "deliberately and artificially" stated to be higher than real parties' actual

32

former prices. Some of the goods are "in-house" goods exclusive to each real party, and the others are nonexclusive goods also sold by competing retailers.

According to the complaints, following an investigation of real parties' online websites, petitioner found that large percentages of the "daily offerings" were offered at (or above) the represented reference price only for periods of 30 days or fewer during the 90-day period preceding the pertinent advertisements. Depending on the particular real party, the complaints assert that 19.38 percent to 51.29 percent of the daily offerings were *never* offered at (or above) the reference price; that 48.65 percent to 88.08 percent of the daily offerings were offered at (or above) the reference price for only 14 days or fewer; and that 83.76 percent to 98.55 percent of the daily offerings were offered at (or above) the reference price for only 30 days or fewer.

As noted above (see pt.C.2.b., *ante*), the complaints assert that for purposes of section 17501, the relevant market is the pertinent real party's "own offering[] of the items." In connection with that assertion, each complaint specifically alleges that with respect to the in-house goods, the real party is the only possible "market" regarding those goods. With respect to nonexclusive items sold by other retailers, however, each complaint asserts that even if the "market" relating to those items encompasses other retailers, real parties' reference prices do not coincide with the prevailing market prices because real parties' actual prices were consistently below the advertised reference prices.

### b.     *Clarity of Section 17501*

As explained below, the complaints state theories of liability regarding the in-house goods and the nonexclusive goods that rely on the same provisions of section 17501, but differ with respect to the markets in which the pertinent prevailing market prices must be determined. We conclude that real parties' facial challenge fails in its entirety because the statute is clear as applied to the "in-house goods" theory, and real parties have otherwise failed to show the statute is unclear as applied to the "nonexclusive goods" theory.

### i.     *In-House Goods*

The theory of liability clearly applicable to the in-house goods is set forth in *Spann, supra*, 307 F.R.D. 508. That decision concluded that under

section 17501, when a retailer sells in-house goods, the retailer's *actual* prices regarding those goods constitute their market prices. (*Id.* at pp. 526-527.) For that reason, the retailer's actual prices for the in-house goods provide an adequate basis for determining whether the retailer's advertised former price claims comply with section 17501. (*Ibid.*)

In *Spann*, the plaintiff asserted a putative class action against real party J.C. Penney, asserting claims, inter alia, under the FAL, including section 17501. (*Spann, supra,* 307 F.R.D. at pp. 512-513.) The claims were predicated on allegations that J.C. Penney advertised false former prices and false price discounts for "'its private branded and exclusive branded apparel and accessories'" on its Internet site and in its stores. (*Id.* at p. 512.) The plaintiff requested an order certifying the class, which the trial court granted. (*Id.* at p. 533.)

In so ruling, the court rejected J.C. Penney's contention that the section 17501 claim was not suitable for class litigation. (*Spann, supra,* 307 F.R.D. at p. 523.) J.C. Penney argued that under the statute, in order to determine the "'prevailing market price,'" the plaintiff was obliged to "analyze each item sold in the market (i.e., by other retailers in the geographic area), not simply the price at which [real party] previously offered the items," and "consider 'price data from [real party] and competing retailers at different times in different, numerous local markets throughout California[.]'" (*Ibid.*) The court disagreed, reasoning that the market relating to J.C. Penney's in-house goods consisted solely of its sales operations because only J.C. Penney sold those goods. (*Id.* at pp. 526-527.) The court thus concluded that the prevailing market prices for such in-house goods were established by J.C. Penney's own sales price data, for purposes of evaluating whether J.C. Penney's claimed former prices coincided with the former prevailing market prices specified in section 17501. (*Ibid.*)

The theory set forth in *Spann* clearly applies to the false or deceptive former price claims alleged in the complaints, insofar as they relate to in-house goods. The complaints generally assert that each real party's former price claims for advertised items "pervasively" violated section 17501 because they reflected neither the prevailing market prices of the in-house goods

34

during the pertinent preceding three-month period nor the prevailing market prices on specified dates. Those allegations encompass "thousands" of in-house goods.

The complaints allege that real parties did not specify dates in their former price claims, and otherwise assert in detail that their actual former prices for advertised items were usually less than their claimed former prices for the items. The complaints allege (1) that for significant percentages of the daily offerings, the items were *never* sold at (or above) the claimed former prices during the 90-day period preceding the advertisements; (2) that for virtually half or more of the daily offerings, the items were sold at (or above) the claimed former prices for only 14 days or fewer during the 90-day period; and (3) that for the vast majority of the daily offerings, the items were sold at (or above) the claimed former prices for only 30 days or fewer during the 90-day period.

As discussed further below, these allegations support the reasonable inference that for a considerable amount of the advertised in-house goods, the claimed former price was greater than the actual prevailing market price during the statutory three-month period. Because real parties' daily offerings did not specify dates upon which the claimed former prices obtained, the complaints clearly state a theory of liability under section 17501, namely, that real parties' claimed former prices for their in-house goods did not coincide with the prevailing market prices for the relevant three-month period.

Because the facial challenge fails if section 17501 clearly applies to real parties, our focus is on whether they have identified any fatal vagueness in the application of the *Spann* theory to the facts as alleged in the complaints. We thus disregard hypothetical problems of application outside those concrete circumstances, including all such problems identified in the 1984 committee report.[20] (*Holder*, *supra*, 561 U.S. at pp. 20-25.)

---

[20] The same is true of other contentions raised by real parties and amici. Real parties argue that section 17501 has been rendered unworkable by unspecified factual changes in retailing wrought by the Internet. Relying on facts not alleged in the complaints, amici maintain that the term "prevailing

We reject real parties' suggestion that the statutory terms "market" and "prevailing market price" are unintelligible. As explained above (see pt. B.3.b., *ante*), those terms have established meanings sufficient to determine -- at least in broad outline -- what section 17501 bans and what it permits. Indeed, the terms, so construed, have long been used in the California Uniform Commercial Code to state a specific measure of damages relating to failed sales transactions (Cal. U. Com. Code, §§ 2708, 2713, 2723, 2724). In that context, courts have recognized that although it is sometimes impossible to identify the relevant market or market price, the existence of those items generally presents factual questions. (*Southern Pacific Milling Co. v. Billiwhack Stock Farm, Ltd.* (1942) 50 Cal.App.2d 79, 88.)

The 1957 Attorney General opinion and *Spann* reached similar conclusions regarding the terms "market" and "prevailing market price" in section 17501. The Attorney General found no uncertainty in the term "prevailing market price" used in the statute, noting that several statutes and judicial decisions applied similar terms. (30 Ops.Cal.Atty.Gen., *supra*, at p. 128.) The court in *Spann* concluded that under the statute, the determination of the relevant market price ordinarily presents factual questions: "[T]he prevailing market price must take into account where, and at what price, the item in question is offered for sale. [Citations.] At bottom, this is a simple and straightforward inquiry that assesses what is the item's proper market and where and how is the item marketed." (*Spann, supra,* 307 F.R.D. at p. 526.)

Real parties and amici contend the specific definition of "prevailing market price" relevant to the statutory prohibition is unworkable. The prohibition relies on the definition in the standard set forth in section 17501, which provides that the "*prevailing* market price" is that which obtains "at *the time of publication* of such advertisement in the *locality* wherein the advertisement is published." (§ 17501, italics added.) Real parties and amici maintain that the italicized terms have no clear meaning.

---

market price" is well defined only for markets for generic or bulk commodities, and thus is inapplicable to sellers of nongeneric goods. These contentions cannot support vagueness challenges asserted on demurrer.

The clear import of the definition is that a retailer, in selecting the medium for the advertised item, determines the particular market in which the prevailing market prices are to be identified.  The relevant market is the one that exists in the locality of consumers likely to see the advertisement at the time it is published, and consists of the vendors then competing to sell the advertised item to them. Accordingly, when, for example, a retailer advertises an item on a specified date in a newspaper whose circulation is limited to Los Angeles, the relevant market price is that which prevails among the retailers selling the advertised item to consumers in Los Angeles on the date in question.  Because the term "prevailing" ordinarily means "common," and applies to "what is predominant or widespread beyond others of its kind or class at a time or place indicated . . . ." (Webster's Third New Internat. Dict. Unabridged (1976) p. 1797), in a typical case, the relevant market price will be the common or predominant price among the sellers in the market where the item is advertised.

The 1957 Attorney General opinion offered the same interpretation of the definition, concluding that -- depending on the content of the advertisement -- the prevailing market price was determined by the actual sales prices of similar goods, or the same good, on the "open local market." (30 Ops.Cal.Atty.Gen., *supra*, at p. 129.)  The Attorney General further stated:  "[I]t is not any price on the market that the statute refers to, for . . . there is often more than one price for the same goods appearing simultaneously on the market, but the most common one." (*Ibid*.; see *Haley v. Macy's Inc.* (N.D. Cal. 2017) 2017 U.S. Dist. LEXIS 210486, *6, *18-*19 [term "prevailing market price," as used in section 17501, is not unconstitutionally vague because prevailing means "predominant" or "most widely occurring"].)

Under the *Spann* theory, as alleged in the complaints, the application of the statutory definition of "prevailing market price" is clear.  Although each real party's online advertisements reach a widespread group of consumers, the real party is the only retailer selling its in-house goods to those consumers.  For that reason, the real party's advertised actual price for an in-house item necessarily constitutes the item's prevailing market price at the time the actual price is advertised.

Real parties' demurrer maintained that the statute did not preclude determining the prevailing market price of an advertised in-house item on the basis of similar products offered by other retailers. In our view, that contention fails in light of the principle that statutes be given their "plain, commonsense meaning." (*Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 919.) The statutory definition, so understood, identifies the relevant market price as that for the "advertised thing," that is, the exclusive in-house item as advertised. Accordingly, if the advertisement specifies a precise item -- say, by reference to name, brand, or other distinctive features (for example, J.C. Penney's "Christina® Dot Print Flyaway Bandeaukini Swim Top – Maternity," which is alleged to be an exclusive in-house product) -- the market and therefore the market price is properly determined on the basis of sales of that item only. (See *In re High Fructose Corn Syrup Antitrust Litigation* (7th Cir. 2002) 295 F.3d 651, 658 [noting that when seller's product is differentiated, seller has "a little pocket of monopoly power"].) Our conclusion finds additional support from *Spann*, which rejected the same contention on essentially similar alleged facts. (*Spann*, *supra*, 307 F.R.D. at pp. 523-528.)

Real parties and amici further contend the term "time of publication," as used in the definition, has no clear meaning. However, California law has long provided that when an act is relevant to the operation of a statute, it is ordinarily treated as falling on a full day, rather than a fraction of a day. (*Municipal Improv. Co. v. Thompson* (1927) 201 Cal. 629, 632 ["The law takes no notice of fractions of a day. Any fraction of a day is deemed a day unless in a particular case it is necessary to ascertain the relative order of occurrences on the same day."].) The time of publication is reasonably construed as a particular day, absent special circumstances. No such circumstances are alleged in the complaints; on the contrary, the complaints refer to real parties' "*daily* offerings." (Italics added.)

Real parties and amici also contend the term "locality" is necessarily vague, arguing that it has numerous possible meanings, and that the advent of the Internet has made its application "even more question-begging" due to the Internet's broad reach. We disagree. Generally, the term "locality," viewed in context (that is, "the locality wherein the advertisement is

38

published"), operates to identify the market for the "advertised item" as the consumers targeted by the advertisement and the sellers competing to sell the item to them. So understood, the Internet raises no special difficulty regarding the term, as it is merely a medium that reaches a very large group of consumers. In the context of advertising former prices of in-house goods, the term "locality" plays no role in identifying relevant competing sellers, as only real parties sell their in-house goods.[21]

Additionally, real parties and amici maintain that the key terms in the statutory prohibition are vague. Central to the *Spann* theory, as set forth above, is one of the two exceptions to the prohibition against former price claims, namely, the provision permitting such a claim when "the alleged *former price* was *the prevailing market price* [as defined in the statute] *within the three months next immediately preceding the publication of the advertisement.*" (§ 17501, italics added.) Real parties and amici contend the italicized terms have no clear meaning.

Broadly speaking, the provision, by its plain language, permits a former price claim only when the claimed former price coincides with the requisite three-month market price. Because the provision refers to "the" prevailing market price during the pertinent three-month period, the requisite market price is reasonably viewed as the common or predominant price during that period. For that reason, in a typical case, a retailer may

---

[21] Real parties' reliance on *Connally*, *supra*, 269 U.S. 385 is misplaced. There, the United States Supreme Court examined an Oklahoma statute that obliged the state to pay state employees "'not less than the current rate of per diem wages in the locality where the work is performed.'" (*Id*. at p. 388.) The court concluded the statute was void for vagueness because the term "locality," as used in the statute, had no clear meaning, stating: "Two men, moving in any direction from the place of operations, would not be at all likely to agree upon the point where they had passed the boundary which separated the locality of that work from the next locality." (*Id*. at p. 394.) In contrast, as explained above, no such problems attend the term under the *Spann* theory.

avoid liability under the statute by advertising a former price that obtains on all or most of the days within the pertinent three-month period.[22] Nonetheless, as discussed above, the appropriate measure of the prevailing market price depends on the specific nature of the market. (See *Spann, supra,* 307 F.R.D. at pp. 526-527.)

In *Spann*, relying on expert testimony, the trial court accepted the statistical "mode" price of an advertised item -- that is, the most commonly occurring price -- as the appropriate objective standard for determining the prevailing three-month market price for that item. (*Spann, supra,* 307 F.R.D. at pp. 516-517, 527-528.) *Spann* lacks a full description of the expert's precise methodology. However, the most straightforward application of the concept of the mode to the facts alleged here is to identify the three-month prevailing price for an item as the price offered in the majority of the "daily offerings" for the period, if there is one, and otherwise as the most frequently occurring price in those offerings.

Although difficulties may arise in some contexts in determining whether a former price claim coincides with the requisite three-month market price, no fatal unclarity attends that determination under the complaints' allegations. The complaints allege that for significant percentages of the advertised items, the actual prices were always below the claimed former prices during the 90-day period; that for approximately half or more than half of the advertised items, the actual prices were below the claimed former prices on all but 14 days (or fewer) during the 90-day period; and that for the vast majority of the advertised items, the actual prices were below the claimed former prices on all but 30 days (or fewer) during the 90-day period.

---

[22] In a statute, the term "month" means "calendar" month, absent any qualification (*Sprague v. Norway* (1866) 31 Cal. 173, 176; Civ. Code, § 14, subd. 4), and a "preceding[]" period stated in months is determined by "counting backward" the requisite number of calendar months (see *Scoville v. Anderson* (1901) 131 Cal. 590, 596). Accordingly, the three-month statutory period here will vary in length from 89 to 92 days, depending upon the specific date when the advertisement was published.

40

In view of the allegations, under any reasonable specification of a requisite three-month market price for the in-house goods -- including the measure suggested by *Spann* -- it is clear that the three-month market prices were often -- and perhaps always -- less than the claimed former prices. The allegations thus suffice to establish that real parties routinely advertised former price claims for in-house goods not coinciding with the three-month market prices. For that reason, much or all of real parties' alleged conduct "readily fall[s]" within the scope of the statute. (*Holder*, *supra*, 561 U.S. at p. 21.)[23]

Real parties suggest the statute is void for vagueness as applied to them because it does not resolve whether the actual prices charged for in-house items in their brick-and-mortar stores may serve as the basis for their online former price claims. However, that contention fails on demurrer because the reasonable inferences raised by the complaints' factual allegations contradict the contention's presupposition, namely, that the prices in the brick-and-mortar stores support the online former price claims. Indeed, the complaints allege that each real party has adopted specific policies ensuring that its online sales prices "are, by the company's own design, in substantial parity with" the sales prices in its "brick-and mortar"

---

[23] We recognize that the complaints rely on a 90-day period, rather than a three-month period. The complaints' allegations are thus technically defective, as the three-month period will comprise 89 to 92 days (see fn. 19, *ante*). Nonetheless, those minor defects are immaterial to whether the complaints state clear claims under section 17501, in view of the patent falsity of the former price claims as alleged in the complaints.

We also observe that the complaints allege that a retailer necessarily contravenes the provision in question by publishing a former price that obtains on fewer than half the number of days within the three-month period. The complaints assert that a seller violates the statute by advertising a reference price for a product "higher than that which it actually offered and sold the product for a majority of the days on which it was offered during the preceding 90 days." However, we are not bound by that legal conclusion.

stores.[24]   In sum, because the statute clearly applies to real parties with respect to their former price claims regarding their in-house goods, their facial challenge to section 17501 fails; for the same reason, their as-applied challenge fails insofar as it asserts that the statute's application is unclear with respect to their former price claims regarding their in-house goods.[25] (*Hoffman Estates, supra,* 455 U.S. at pp. 497-504.)

---

[24]   Real parties' demurrer contended the allegations were defective because they were pleaded on information and belief.  We disagree.  As Witkin explains, "[i]t sometimes happens that a plaintiff . . . lacks knowledge and the means of obtaining knowledge of facts material to his or her cause of action . . . .  Usually the matters are peculiarly within the knowledge of the adverse party, and the pleader can learn of them only from statements of others.  In this situation, the pleader may plead what he or she believes to be true as the result of information . . . the pleader has received."  (4 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 398, pp. 537-538.)  However, "[i]t is improper to plead on information and belief when the pleader had actual or presumed knowledge of the facts."  (*Id*. at § 399, p. 539.)

Here, real parties are likely to have records of the prices for in-house items sold in their brick-and-mortar stores.  In contrast, petitioner could have obtained that price data only by visiting real parties' brick-and-mortar stores on a daily basis during its investigations in order to monitor the prices of the "thousands" of in-house goods.  Nothing in the complaints suggest that was possible.  For that reason, the price information in question must be regarded as "peculiarly" within real parties' knowledge.  (4 Witkin, *supra*, Pleading, § 398, p. 538.)

[25]   In a related contention, amici argue that the application of the phrase, "the prevailing market price . . . within the three months next immediately preceding the publication of the advertisement," is uncertain with respect to online retailers who publish continuous advertisements for items.  We disagree.  Because the statute plainly aims at providing market price information useful to consumers, the three-month period is properly construed as a "rolling" period, that is, one whose beginning and end changes each day, thus requiring a daily recalculation of the prevailing market price during the three-month period.  (Cf. *City of Brentwood v. Central Valley Regional Water Quality Control Board* (2004) 123 Cal.App.4th 714, 727-733

## ii. *Nonexclusive Goods*

We turn to the as-applied challenge, insofar as it is directed at the sole tenable theory of liability alleged in the complaints regarding nonexclusive goods, namely, the theory that disregards the complaints' erroneous legal conclusion that each real party's business operation constitutes the "market." That theory relies on the allegations that even if the "market" relating to nonexclusive goods encompasses other retailers, real parties' claimed former prices do not coincide with the requisite market prices.

The theory in question thus differs from the *Spann* theory primarily with respect to the market or markets in which the prevailing market prices are to be determined. Under section 17501, as construed above (see pt.D.3.b.i., *ante*), the market for each nonexclusive item advertised by a real party consists of all the retailers selling the "advertised item" to the consumers targeted by the real party's advertisement. In those markets, the real party's actual price for a nonexclusive item will not establish the item's prevailing market price. (*Spann*, *supra*, 307 F.R.D. at p. 526 [ordinarily, "the prevailing market price is not simply the retailer's actual original price"].)

Regarding the nonexclusive goods, the complaints rely on the same factual allegations regarding real parties' advertising, but contend real parties' claimed former prices did not coincide with the requisite three-month market prices because real parties' actual prices were consistently below the claimed former prices. Although on demurrer we are not bound by all factual conclusions alleged in a complaint, the inference asserted here is, in fact, reasonable because in competitive markets, the actual prices offered by vendors selling the same item tend to converge on the market price. (*Knapp v. Art.com, Inc.* (N.D.Cal. 2016) 2016 U.S. Dist. LEXIS 78128, *6 [plaintiff adequately stated section 17501 claim on basis of similar factual allegations supporting same inference]; see *In re High Fructose Corn Syrup Antitrust Litigation, supra,* 295 F.3d at pp. 657-658 [when sellers of identical item compete, no seller can generally set its own price above or below the market price, absent special circumstances].) Accordingly, the factual allegation that real parties' advertised former prices were consistently higher than their

[concluding that statutory period was "rolling" because that interpretation best effectuated legislative intent].)

43

actual prices supports the inference that those advertised prices were not the prevailing market prices during the requisite three-month period.  The complaints thus state a cognizable theory of liability under section 17501 with respect to the nonexclusive goods.

We must reject any as-applied challenge to the "nonexclusive goods" theory on demurrer because it is premature, that is, it hinges on facts neither pleaded in the complaints nor subject to judicial notice.  (*Tobe*, *supra*, 9 Cal.4th at pp. 1083, 1088, 1092-1093.)  Because the "nonexclusive goods" theory differs from the *Spann* theory with respect to the pertinent markets -- and thus potentially the appropriate measure of prevailing market prices -- the key issues raised by the as-applied challenge attend the application of the statutory terms "market" and "prevailing market price."  No facts regarding the markets in which real parties sell nonexclusive goods have been pleaded in the complaints or submitted for appropriate judicial notice.  As explained in *Holder*, real parties may not predicate their as-applied challenge on hypothetical problems not tied to their concrete circumstances.  (*Holder*, *supra*, 561 U.S. at pp. 23-25.)  Accordingly, as with real parties' "free speech" challenge, on the record before us their as-applied challenge fails.

## DISPOSITION

Let a peremptory writ of mandate issue directing that respondent trial court vacate its order sustaining real parties' demurrer to the section 17501 claims without leave to amend, and enter a new order denying that demurrer.  Petitioner is awarded costs.

**CERTIFIED FOR PUBLICATION.**

MANELLA, P. J.

We concur:

WILLHITE, J.                                           CURREY, J.

44