# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JUAN C. ROJAS, derivatively and on behalf of J.C. PENNEY COMPANY, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2018-0755-AGB |
| MARVIN R. ELLISON, MYRON E. ULLMAN III, PAUL J. BROWN, COLLEEN BARRETT, THOMAS ENGIBOUS, AMANDA GINSBERG, B. CRAIG OWENS, LISA A. PAYNE, DEBORA A. PLUNKETT, LEONARD H. ROBERTS, STEPHEN SADOVE, JAVIER G. TERUEL, R. GERALD TURNER, and RONALD W. TYSOE, Defendants, and | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| J.C. PENNEY COMPANY, INC., | ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 30, 2019
Date Decided: July 29, 2019

Thomas A. Uebler and Jeremy J. Riley, MCCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, Delaware; Melinda A. Nicholson, KAHN SWICK & FOTI, LLC, New Orleans, Louisiana; Roger A. Sachar, NEWMAN FERRARA LLP, New York, New York, *Attorneys for Plaintiff Juan C. Rojas*.

William M. Lafferty, Susan W. Waesco, and Riley T. Svikhart, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Meryl L. Young, GIBSON, DUNN & CRUTCHER LLP, Irvine, California; Jason J. Mendro and Lissa M. Percopo, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., *Attorneys for Defendants Marvin R. Ellison, Myron E. Ullman III, Paul J. Brown, Colleen Barrett, Thomas Engibous, Amanda Ginsberg, B. Craig Owens, Lisa A. Payne, Debora A. Plunkett, Leonard H. Roberts, Stephen Sadove, Javier G. Teruel, R. Gerald Turner, and Ronald W. Tysoe, and Nominal Defendant J.C. Penney Company, Inc.*

**BOUCHARD, C.**

A stockholder of J.C. Penney Company, Inc. asserts in this derivative action that the company's directors breached their fiduciary duty of loyalty by consciously disregarding their responsibility to oversee J.C. Penney's compliance with California laws governing price-comparison advertising. Plaintiff's central allegation is that the directors ignored a red flag in the form of a settlement of a civil case known as the *Spann* action, pursuant to which J.C. Penney agreed to pay up to $50 million for the benefit of a state-wide class of California consumers and to implement certain improvements to its price comparison advertising policy and practices.

According to plaintiff, J.C. Penney's board failed to ensure that the company abided by the terms of the *Spann* settlement. Plaintiff implies that, had the board done so, the company might have avoided further civil litigation over its pricing practices that was launched against the company less than three months after court approval of the *Spann* settlement.

Defendants have moved to dismiss the complaint under Court of Chancery Rule 23.1 for failure to make a demand on the board before filing suit. The independence of J.C. Penney's directors is unquestioned and no contention has been made that any of them have divided loyalties because of a personal financial interest in any underlying transaction. Plaintiff argues only that at least nine of the eleven members of the board as it existed when this lawsuit was filed face a substantial

1

likelihood of personal liability with respect to the oversight claims asserted in this case.

The standard under Delaware law for imposing oversight liability on a director is an exacting one that requires evidence of bad faith, meaning that "the directors knew that they were not discharging their fiduciary obligations."[1] For the reasons explained below, I conclude after carefully reviewing the allegations of the complaint and the documents incorporated therein that plaintiff has failed to allege facts from which it reasonably may be inferred that any of the directors on the board when this action was filed consciously allowed J.C. Penney to violate any price-comparison advertising laws so as to demonstrate that they acted in bad faith.

Plaintiff thus has failed to plead with particularity that these individuals face a substantial likelihood of liability for the claims asserted in this case. Accordingly, making a demand on the board would not have been futile and the complaint will be dismissed with prejudice.

## I.    BACKGROUND

Unless otherwise noted, the facts recited in this opinion are based on the allegations of the Verified Stockholder Derivative Complaint ("Complaint") and documents incorporated therein.[2] They include a number of documents produced to

---

[1] *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

[2] *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) (holding that "plaintiff may not reference certain documents outside the complaint and at the same time prevent

plaintiff in response to a demand for books and records plaintiff made under 8 *Del. C.* § 220.[3]  Any additional facts are either not subject to reasonable dispute or are subject to judicial notice.

## A.     The Parties

Nominal defendant J.C. Penney Company, Inc. ("J.C. Penney" or the "Company") is a Delaware corporation with its principal place of business in Plano, Texas.[4]  J.C. Penney engages in the business of selling merchandise and services to consumers through approximately 865 department stores in the United States and Puerto Rico and online through its website.  Plaintiff Juan C. Rojas alleges that he has been a stockholder of J.C. Penney continuously since at least July 2013.

The defendants consist of fourteen current or former members of the Company's board of directors (the "Board").[5]  When the Complaint was filed, the Board had eleven members (the "Demand Board"), nine of who are named as defendants:  Paul J. Brown, Amanda Ginsberg, B. Craig Owens, Lisa A. Payne,

---

[3] The Section 220 documents extended up to June 2017.  Compl. ¶ 18 n.7.  Plaintiff agrees that the court may rely on these documents in deciding this motion.  *See* Tr. 46 (Apr. 30, 2019) (Dkt. 33).

[4] Documents cited herein often refer to the Company as "JCP" or "JCPenney."  Those abbreviations have been left unaltered.

[5] The Complaint also named former director J. Paul Raines as a defendant, but all claims against him were dismissed on November 30, 2018.  *See* Dkt. 8.

the court from considering those documents' actual terms" in connection with a motion to dismiss).

Debora A. Plunkett, Leonard H. Roberts, Javier G. Teruel, R. Gerald Turner, and Ronald W. Tysoe. The other two members of the Demand Board are Wonya Y. Lucas and Jill Soltau, who was appointed as the Company's new CEO effective October 15, 2018. Owens, Payne, Plunkett, Teruel, and Roberts currently serve on the Board's Audit Committee.

The remaining five defendants are former directors of J.C. Penney: Colleen Barrett, Thomas Engibous, Stephen Sadove, Marvin R. Ellison, who served as J.C. Penney's CEO from July 2015 through May 2018, and Myron E. Ullman III, who served as CEO from December 2004 through December 2011 and April 2013 through July 2015. Sadove is a former member of the Board's Audit Committee.

## B.    J.C. Penney's Early Use of Allegedly False Reference Pricing

Like most retailers, J.C. Penney offers sales and promotions to market merchandise. An important concept in this case is "reference pricing." The price at which a product actually has been sold is known as the "reference price." That price provides a point of reference—or a baseline—from which to determine the percentage or amount of a discount when a retailer has a sale. To use a simple example, if the price at which a retailer actually sold a particular dress is $100 and the retailer put that dress on sale for $40, the reference price would be $100 and the percentage of the discount would be 60%.

4

Rojas alleges that J.C. Penney began utilizing "false reference pricing" in 2011, and perhaps earlier. False reference pricing occurs when the "original price" for a product identified in an advertisement is higher than the price the product actually sold for, which makes the discount appear bigger and "plays on the psychology of the consumer's desire to strike a good bargain."[6] Using the dress example, if a retailer were to mark up the price of the dress to $120 (even though the retailer previously sold the dress for only $100) and then put that dress on sale for $40, the percentage of the discount using a false reference price would be about 67%.

In January 2012, J.C. Penney's then-new CEO Ron Johnson allegedly "admitted that JCP had been engaging in (illegal) false reference pricing, disclosing that for years the Company has been slowly increasing prices, that the Company's purported regular retail prices had 'no integrity,' and that almost every single item sold by the Company was at a discounted rate."[7] Johnson further stated "during an analyst call that fewer than 1 in 500 units were ever sold at the advertised 'regular price.'"[8] In February 2012, J.C. Penney adopted a new strategy, called "Fair and Square Every Day" pricing, under which J.C. Penney "offered its products at everyday low pricing" and did not offer sales or discounts on products.[9] When

---

[6] Compl. ¶¶ 67-68.

[7] *Id.* ¶ 69.

[8] *Id.*

[9] *Id.* ¶ 70.

Johnson left the Company for failing to "radically overhaul the department store chain," J.C. Penney allegedly returned to using false reference pricing.[10]

### C. The *Spann* Action

In 2012, Cynthia Spann, a J.C. Penney customer, filed an action against J.C. Penney in the United States District Court for the Central District of California on behalf of a class of California consumers (the "*Spann* action"). As amended, the complaint asserted that J.C Penney had engaged in false reference pricing in violation of California consumer protection statutes, including Section 17501 of the California Business & Professions Code.[11] The *Spann* action concerned alleged false reference pricing "of JCP's private branded and exclusive branded apparel and accessories."[12] It did not involve any products J.C. Penney sold that also were sold at other retailers.

In July 2014, J.C. Penney adopted the "Policy for Former Price Comparison Advertising" (the "2014 Pricing Policy"), which provided rules to avoid false reference pricing.[13] The 2014 Pricing Policy established as a "general rule" that:

> The former price to which JCPenney refers in its price comparison advertising must be "the actual bona fide price" at which the article was

---

[10] *Id.* ¶ 71. Although the Complaint does not allege when Johnson stepped down, this must have occurred by April 2013 since it is alleged that Ullman began serving a second term as CEO at that time. *Id.* ¶ 26.

[11] *Id.* Ex. A ¶¶ 56-90 (Fourth Amended Complaint).

[12] *Id.* ¶ 73; *see also* Tr. 15.

[13] Compl. ¶¶ 74-75; *id.* Ex. H.

"openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of business, honestly and in good faith."[14]

This language was taken directly from the Federal Trade Commission's guidelines concerning former price comparisons.[15] The 2014 Pricing Policy also required that the "landing period"—the time when a product initially is sold—be "[a]t least 14 consecutive days before the first price break event" and that for "basic items" the price must be used at least "14 out of every rolling 90 days" and "70 days annually."[16]

On July 20, 2015, the Board's Audit Committee discussed the *Spann* action.[17] The minutes of the meeting reflect that Janet Link, the Company's General Counsel, "reviewed . . . the status of the *Spann* pricing compliance class action lawsuit" and that "[a] discussion ensued during which Ms. Link responded to questions asked and comments made by the Committee members."[18]

On September 10 and 11, 2015, the parties in the *Spann* action entered into a Memorandum of Settlement that "included continued oversight of the Company's

---

[14] *Id.* ¶ 75 (quoting Ex. H).

[15] *Id.* ¶ 76 (citing 16 C.F.R. § 233.1).

[16] *Id.* ¶¶ 77-78 (quoting Ex. H).

[17] *Id.* ¶¶ 79-80; *id.* Ex. I.

[18] *Id.* Ex. I at JCP001274; *id.* ¶ 82.

pricing policies."[19] On September 17, 2015, the full Board of J.C. Penney discussed the *Spann* action at a regular meeting. The minutes of the meeting reflect that the General Counsel:

> provided an update on the Company's pricing class action litigation in California, titled *Spann v. J.C. Penney Corporation, Inc.* She reviewed the history of the case as well as recent developments. A discussion ensued during which Ms. Link responded to questions asked and comments made by the directors.[20]

On November 10, 2015, the parties in the *Spann* action filed their formal Settlement Agreement with the district court.[21] The next day, J.C. Penney issued a press release announcing the settlement, in which it stated that "[t]he settlement agreement also contemplates that JCPenney will implement and/or continue certain improvements to its price comparison advertising policies and practices, including periodic monitoring and training programs designed to ensure compliance with California's advertising laws."[22]

In the Settlement Agreement, J.C. Penney agreed to pay up to $50 million for the benefit of a state-wide class of California consumers, with the amount for claimants (after the payment of attorneys' fees and related costs) to be payable in

---

[19] *Id.* Ex. B § 1.1.

[20] *Id.* Ex. J at JCP001282; *id.* ¶ 87.

[21] *Id.* Ex. B; *id.* ¶ 82.

[22] *Id.* ¶ 96 n.29 (citing November 13, 2015 Form 8-K); J.C. Penney Company, Inc., Current Report (Form 8-K) (Nov. 13, 2015) (attaching the Company's November 11, 2015 press release).

cash or store credits.[23]  J.C. Penney also agreed that as of the date of the settlement it was not violating, and would not violate in the future, federal or California law, including California price-comparison advertising laws:

> JCPenney agrees that its advertising and pricing practices as of the date of this Settlement Agreement, and continuing forward, will not violate Federal or California law, including California's specific price-comparison advertising statutes.  Specifically, JCPenney agrees that any former price to which JCPenney refers in its price comparison advertising will be the actual, bona fide price at which the item was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of business, honestly and in good faith.  As a further direct result of this Litigation, JCPenney shall implement a compliance program, which will consist of periodic (no less than once a year) monitoring, training and auditing to ensure compliance with California's price comparison laws.[24]

The Settlement Agreement contains mutual releases and further provides that "JCPenney expressly denies liability for the claims asserted and specifically denies and does not admit any of the pleaded facts not admitted in its pleadings in the Litigation."[25]

On July 28, 2016, J.C. Penney filed with the district court a response to an objection to the proposed settlement in which it provided an update concerning its implementation of new pricing policies and procedures:

---

[23] *Id.* Ex. B §§ 5.1, 6.1.

[24] *Id.* Ex. B § 6.1.7.

[25] *Id.* Ex. B §§ 13.1 (Settlement Class Members Released Claims), 13.2 (JCPenney Released Claims), 17.1 (Statement of No Admission).

> JCPenney . . . can represent that it has implemented a new price-comparison advertising policy in direct response to this litigation. This policy has remained in effect at all times since it was enacted, including since the date of the Settlement Agreement. Moreover, pursuant to this new policy, JCPenney has created a Promotional Pricing Governance Committee and has instituted regular training sessions. JCPenney has also created a new position, Director of Pricing Compliance, whose primary responsibility is to monitor and ensure compliance with the new pricing policy.[26]

On September 30, 2016, the district court approved the proposed settlement of the *Spann* action.[27]

## D. The California Action

On December 7, 2016, the Los Angeles City Attorney filed an action against J.C. Penney on behalf of the People of the State of California in California Superior Court (the "California Action"). As amended, the complaint asserts violations of California's consumer protection statutes.[28] As part of a coordinated effort, the City Attorney filed actions against three other national retailers (Macy's, Kohl's, and Sears) in the same court, asserting similar claims under the same statutes.[29]

One of the claims in the California Action is governed by Section 17501 of the California Business & Professions Code. That statute provides that:

---

[26] *Id.* Ex. C at 2; *id.* ¶ 96.

[27] *Id.* ¶¶ 9, 137.

[28] *Id.* Ex. D ¶¶ 82-107.

[29] *See id.* Ex. F (California Superior Court decision ruling on separate demurrers of Sears, Kohl's, Macy's, and J.C. Penney); *People v. Superior Ct.*, 246 Cal. Rptr. 3d 128, 134 (Cal. Ct. App. 2019).

10

> No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price . . . within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.[30]

The Los Angeles City Attorney interpreted this provision to require that a product must be offered at the reference price "for a majority of the days on which it was offered during the preceding 90 days," *i.e.*, for at least forty-six of those ninety days.[31]

On July 5, 2018, the California Superior Court granted in part and denied in part demurrers each of the four retailers had filed to dismiss the claims asserted against them. With respect to the claims asserted under Section 17501 of the Business and Professions Code, the California Superior Court granted the retailers' motions, finding "on the facts alleged [that] the statute is unconstitutionally vague as applied to these Defendants."[32] With respect to the City Attorney's forty-six-day theory, the court explained:

> The People's selection of a 46 day requirement is an arbitrary interpretation of section 17501, it is not supported by existing case law, and other enforcement authorities are not bound by that interpretation. Section 17501 provides no guidance for determining how long within a three month period, a price must "prevail" in order to excuse a retailer

---

[30] Cal. Bus. & Prof. Code § 17501.

[31] Compl. Ex. D ¶ 97; *id.* ¶ 102.

[32] *Id.* Ex. F at 5; *id.* ¶ 108 n.40.

from the duty of "clearly, exactly and conspicuously" stating the date when the former price did prevail.[33]

On April 16, 2019, the Court of Appeal of California reversed the dismissal of the Section 17501 claims, finding that the statute was not void for vagueness.[34]

The Court of Appeal decision highlights an important difference between the *Spann* action and the California Action. As explained above, the *Spann* action only concerned J.C. Penney's sales of private branded and exclusive branded products. By contrast, the California Action concerns J.C. Penney's sale of products on its website, which includes non-exclusive products sold by other retailers.[35] With respect to non-exclusive goods, the Court of Appeal held that the "prevailing market price" for purposes of Section 17501 is based on what all retailers selling a particular item have charged and not just the price at which J.C. Penney had sold the item:

> The theory in question thus differs from the *Spann* theory primarily with respect to the market or markets in which the prevailing market prices are to be determined. Under section 17501, . . . the market for each nonexclusive item advertised by a real party consists of all the retailers selling the "advertised item" to the consumers targeted by the real party's advertisement. In those markets, the real party's actual price for a nonexclusive item will not establish the item's prevailing market price.[36]

The California Action is still ongoing.

---

[33] *Id.* Ex. F at 15.

[34] *People v. Superior Ct.*, 246 Cal. Rptr. 3d at 135.

[35] Compl. ¶ 106; Tr. 16.

[36] *People v. Superior Ct.*, 246 Cal. Rptr. 3d at 160.

### E. The Cavlovic Action

On December 16, 2016, shortly after the California Action was filed, a J.C. Penney customer in Kansas filed a putative consumer class action in Kansas state court for violations of the Kansas Consumer Protection Act and unjust enrichment (the "Cavlovic Action").[37] Cavlovic's complaint "alleged that she fell victim to [a] pricing scheme when she paid $171.66 for a pair of earrings that were advertised as originally costing $524.98" even though J.C. Penney had never actually sold the earrings at this higher price.[38] After J.C. Penney unsuccessfully moved to dismiss the Cavlovic Action, it settled with Cavlovic on her individual claims only.[39]

### F. Additional Board Discussions About Pricing

From late 2016 through June 2017,[40] the Board engaged in at least two additional discussion about pricing,[41] although the minutes of the meetings do not refer specifically to any of the lawsuits discussed above or whether J.C. Penney's pricing policy complies with applicable laws.

On November 18, 2016, the Company's Chief Financial Officer (Ed Record) reviewed with the Board a slide presentation and engaged in a discussion of ways to

---

[37] Compl. ¶ 110; *id.* Ex. E ¶¶ 76-108.

[38] *Id.* ¶ 110.

[39] *Id.* ¶¶ 111-12.

[40] As noted above, June 2017 is the endpoint of the documents produced in response to Rojas' demand to inspect the Company's books and records. *Id.* ¶ 18 n.7.

[41] *Id.* ¶ 113.

"optimize pricing."[42]  The minutes reflect that Record "discussed the science around pricing as well as the Company's desire to bring more analytical rigor to its pricing strategies."[43]

On March 1, 2017, the Company's Vice President of Pricing (Prosun Niyogi) updated the Board on the Company's pricing initiatives.[44]  The minutes state that he "reviewed the current state of the Company's pricing and promotional structure" and "then discussed the Company's pricing objectives and key opportunities as well as the potential impact to the Company from changes in the pricing process."[45]

### G.    The 2017 Pricing Policy

In May 2017, the Company adopted a new pricing policy (the "2017 Pricing Policy").[46]  The 2017 Pricing Policy reiterates the "general rule" from the 2014 Pricing Policy,[47] but contains a number of modifications.  For example, the 2017 Pricing Policy provides that if "a company-wide [Buy More, Save More] event occurs during an item's Landing Period, the item(s) will be included in the company-

---

[42] *Id.* ¶ 114 (citing *id.* Ex. K).

[43] *Id.* Ex. L at JCP001336.

[44] *Id.* ¶ 116.

[45] *Id.* (quoting *id.* Ex. M at JCP001747).

[46] *Id.* ¶ 118 (citing *id.* Ex. N).

[47] *Id.* ¶ 120; *compare id.* Ex. H at JCP0001752, *with id.* Ex. N at JCP001915.

wide offer" and it expanded "the ability to use an enterprise-wide, store-wide, or web-based coupon[] . . . during an item's landing period."[48]

As noted above, the Settlement Agreement in the *Spann* action obligated J.C. Penney to create a compliance program and, in June 2016, the Company represented to the district court that it "created a new position, Director of Pricing Compliance, whose primary responsibility is to monitor and ensure compliance with the new pricing policy."[49] The 2017 Pricing Policy reflects that, in addition to hiring a new Director of Pricing Compliance, the Company also had hired two Compliance Specialists.[50]

## H. Procedural History

On October 19, 2018, Rojas filed the Complaint asserting two derivative claims. Count I asserts that each of the individual defendants breached their fiduciary duties by failing to engage in oversight with respect to the Company's compliance with California's consumer protection laws. Count II asserts that each of the six defendants who currently serve (Owens, Payne, Plunkett, Teruel, and Roberts) or previously served (Sadove) on the Audit Committee breached their

---

[48] *Id.* ¶ 121 (quoting *id.* Ex. N at JCP001916).

[49] *Id.* Ex. C at 2.

[50] *Id.* Ex. N at JCP001918.

fiduciary duties because they "consciously failed to monitor their information and reporting systems for compliance relating to the Company's product pricing."[51]

On December 18, 2018, defendants moved to dismiss the Complaint solely under Court of Chancery Rule 23.1.[52]

## II.  ANALYSIS

"A basic principle of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."[53]  For this reason, the decision to bring or refrain from bringing a derivative claim on behalf of the corporation is the responsibility of the board of directors in the first instance.[54]  This approach "is designed to give a corporation, on whose behalf a derivative suit is brought, the opportunity to rectify the alleged wrong without suit or to control any litigation brought for its benefit."[55]

Under Court of Chancery Rule 23.1, a stockholder who wishes to assert a derivative claim on behalf of a corporation must "allege with particularity the efforts,

---

[51] *Id.* ¶ 161.

[52] Defendants advance a cursory argument that certain aspects of plaintiff's claims are time-barred.  *See* Defs.' Opening Br. 27 (Dkt. 15).  This argument is irrelevant to the question of demand futility under Rule 23.1 and thus is not addressed in this opinion.

[53] *Spiegel v. Buntrock*, 571 A.2d 767, 772-73 (Del. 1990).

[54] *Id.*

[55] *Lewis v. Aronson*, 466 A.2d 375, 380 (Del. Ch. 1983), *rev'd on other grounds*, 473 A.2d 805 (Del. 1984).

if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[56]  Under the heightened pleading requirements of Rule 23.1, conclusory "allegations of fact or law not supported by the allegations of specific fact may not be taken as true."[57]

There are two tests under Delaware law for determining whether making a demand on the corporation's board of directors to pursue a claim may be excused as futile:  the *Aronson* test and the *Rales* test.[58]  This court applies the first test, from *Aronson v. Lewis*,[59] when "a *decision* of the board of directors is being challenged in the derivative suit."[60]  The second test, from *Rales v. Blasband*,[61] governs when "the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit," such as "where directors are sued derivatively because they have failed to do something."[62]

---

[56] Del. Ch. Ct. R. 23.1.

[57] *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[58] Both tests ultimately focus on the same inquiry, whether "the derivative plaintiff has shown some reason to doubt that the board will exercise its discretion impartially and in good faith."  *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 986 (Del. Ch. 2007).

[59] 466 A.2d 375.

[60] *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993).

[61] *Id.*

[62] *Id*. at 933-34 & n.9.  *Rales* also applies "where a business decision was made by the board of a company, but a majority of the directors making the decision have been

17

All parties agree that the *Rales* test applies in this case because Rojas is not challenging a specific board action or decision, but rather an alleged lack of board oversight.[63] This means that demand can be excused only if "the particularized factual allegations . . . create a reasonable doubt that, as of the time the complaint [was] filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[64]

Here, Rojas does not challenge the independence of any members of the Demand Board and does not contend that any of them have divided loyalties because of a personal financial interest in any underlying transaction. Rojas argues only that a majority of the Demand Board is interested because they are exposed to a substantial likelihood of personal liability. More specifically, Rojas argues that a reasonable doubt exists regarding whether the Demand Board could have considered, impartially and in good faith, whether to pursue the claims in the Complaint because at least nine of its eleven members face a substantial likelihood of liability for failing to exercise their oversight obligations under *Caremark*. It is

---

replaced" and where "the decision being challenged was made by the board of a different corporation." *Id.* at 934.

[63] Defs.' Opening Br. 13; Pl.'s Answering Br. 27 (Dkt. 19).

[64] *Rales*, 634 A.2d at 934.

18

black letter law that "the mere threat of personal liability" is insufficient to make this showing.[65]

Chancellor Allen famously remarked in *Caremark* that to prove liability for failing to monitor corporate affairs is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[66] Consistent with that sentiment, our Supreme Court held in *Stone v. Ritter* that, to plead a substantial likelihood of liability under *Caremark*, a stockholder must allege particularized facts to show that either (1) "the directors utterly failed to implement any reporting or information system or controls" or that (2) "having implemented such a system or controls, [the directors] consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[67]

Under either theory, the "imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations."[68] "The need to demonstrate scienter to establish liability under an oversight theory follows not only from *Caremark* itself, but from the existence of charter provisions

---

[65] *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984).

[66] *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

[67] 911 A.2d at 370.

[68] *Id.*

19

exculpating directors from liability for breaches of the duty of care that have become ubiquitous in corporate America."[69]

Rojas argues that a majority of the Demand Board faces a substantial likelihood of liability under both prongs of *Caremark*.[70]  He further argues that a majority of the J.C. Penney Board is conflicted because of the ongoing nature of the California Action.  The court concludes that each of these arguments is without merit for the reasons discussed below and that plaintiff has failed to establish that any member of the Demand Board faces a substantial likelihood of liability under *Caremark* or is conflicted based on the California Action.

### A. The Complaint Fails to Allege Facts Sufficient to Show that the Directors Are Exposed to a Substantial Likelihood of Liability for Utterly Failing to Implement a System of Controls

Rojas makes a faint-hearted attempt to argue that the members of the Demand Board face a substantial likelihood of personal liability under the first prong of *Caremark* for "utterly failing" to implement any reporting or information system or controls with respect to the Company's advertising and pricing policies.  Focusing on when the *Spann* action settled, Rojas asserted in his Complaint that "there is no evidence that any Board member sought to put in place any safeguards to ensure that

---

[69] *Reiter v. Fairbank*, 2016 WL 6081823, at *7 (Del. Ch. Oct. 18, 2016).  It is undisputed that J.C. Penney's certificate of incorporation exculpated the Company's directors from liability for breaches of the duty of care.

[70] Pl.'s Answering Br. 48-49.

the Company's advertising and pricing policies were in conformance with the Consumer Protection Laws."[71]  When briefing this motion, however, Rojas effectively abandoned this position, conceding that:  "There is no assertion that the reporting system put in place at the time of the *Spann* settlement is inadequate, or that the Board did not know it existed."[72]

Earlier this year, in *Marchand v. Barnhill*, our Supreme Court expounded on the duties Delaware law imposes on directors to ensure that board-level monitoring and reporting systems are in place:

> As with any other disinterested business judgment, directors have great discretion to design context- and industry-specific approaches tailored to their companies' businesses and resources.  But *Caremark* does have a bottom-line requirement that is important:  the board must make a good faith effort—*i.e.*, try—to put in place a reasonable board-level system of monitoring and reporting.[73]

The high court further explained that, "[i]n decisions dismissing *Caremark* claims, the plaintiffs usually lose because they must concede the existence of board-level systems of monitoring and oversight such as a relevant committee, a regular protocol requiring board-level reports about the relevant risks, or the board's use of third-party monitors, auditors, or consultants."[74]  That is the case here.

---

[71] Compl. ¶¶ 14-15.

[72] Pl.'s Answering Br. 51.

[73] *Marchand v. Barnhill*, -- A.3d --, 2019 WL 2509617, at *12 (Del. 2019) (internal citations omitted).

[74] *Id.* at *14.

21

The Complaint and documents incorporated therein indicate that J.C. Penney had a board-level reporting system in place at the time of the *Spann* action to monitor the Company's compliance with laws and regulations. Specifically, the Board's Audit Committee was "charged with legal and regulatory compliance" and its charter required it:

> 1. To oversee the Company's compliance with the law and regulation and, in connection therewith, to review and assess on no less than an annual basis, a report from the Company's General Counsel regarding the implementation and effectiveness of the Company's legal compliance and ethics program; . . .
>
> 4. To discuss with management any correspondence with regulators or governmental agencies and any litigation or other legal matters that raise material issues regarding the Company's financial statements or accounting policies or its compliance with law or regulation.[75]

Consistent with its mandate, the Audit Committee received a report from the Company's General Counsel, Janet Link, on July 20, 2015, about seven weeks before the Company entered into a Memorandum of Settlement in the *Spann* action. Ms. Link reviewed with the Audit Committee "the status of the *Spann* pricing compliance class action lawsuit" and "responded to questions asked and comments made by the Committee members."[76]

---

[75] Compl. ¶ 55.

[76] *Id.* Ex. I at JCP001274; *id.* ¶ 82.

About two months later, shortly after the Company entered into the Memorandum of Settlement but before the formal Settlement Agreement was filed with the district court, the matter was reviewed with the Board. On September 17, 2015, Ms. Link provided an "update" on the *Spann* action that included a review of "the history of the case as well as recent developments."[77]

As this court has explained, our Supreme Court appears to have been quite deliberate in its use of the adverb "utterly"—a "linguistically extreme formulation"—to set the bar high when articulating the first way to hold directors personally liable for a failure of oversight under *Caremark*.[78] Given the facts just recited, it cannot be said that J.C. Penney's directors "utterly failed to implement any reporting or information system or controls" relevant to complying with price-comparison advertising laws or, in the more recent words of *Marchand*, that they made no good faith effort to "try."[79] Accordingly, Rojas has failed to allege facts

---

[77] *Id.* ¶ 87 (quoting *id*. Ex. J at JCP001282). The use of the word "update" in the minutes suggests that the Board received an earlier report about the *Spann* action, although no minutes have been provided reflecting such a discussion. Furthermore, as discussed above, the Board discussed pricing during two subsequent meetings—in November 2016 and March 2017—but the minutes of those meetings do not refer specifically to J.C. Penney's pricing policy or its compliance with laws applicable to comparison pricing.

[78] *Horman v. Abney*, 2017 WL 242571, at *8 n.46 (Del. Ch. Jan. 19, 2017) ("'Utterly failed' is a linguistically extreme formulation.") (quoting Bradley R. Aronstam & David E. Ross, *Retracing Delaware's Corporate Roots Through Recent Decisions: Corporate Foundations Remain Stable While Judicial Standards of Review Continue to Evolve*, 12 Del. L. Rev. 1, 13 n.73 (2010)).

[79] *Stone*, 911 A.2d at 370; *Marchand*, 2019 WL 2509617, at *12.

23

sufficient to support a reasonable inference that the members of the Demand Board are exposed to a substantial likelihood of personal liability under the first prong of *Caremark*.

**B.  The Complaint Fails to Allege Facts Sufficient to Show that the Directors Are Exposed to a Substantial Likelihood of Liability for Consciously Failing to Monitor**

Rojas' primary argument for establishing demand futility proceeds under the second prong of *Caremark*, *i.e.*, that "having implemented such a system or controls, [the directors] consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[80]

To establish liability under this theory, "a complaint must allege (1) that the directors knew or should have known that the corporation was violating the law, (2) that the directors acted in bad faith by failing to prevent or remedy those violations, and (3) that such failure resulted in damage to the corporation."[81]  The typical way to plead that the directors knew or should have known that a corporation was violating the law is to allege facts demonstrating that the board was alerted to "evidence of illegality—the proverbial 'red flag.'"[82]  "Under Delaware law, red flags

---

[80] *Stone*, 911 A.2d at 370.

[81] *In re Qualcomm Inc. FCPA S'holder Deriv. Litig.*, 2017 WL 2608723, at \*2 (Del. Ch. June 16, 2017) (internal quotation marks omitted).

[82] *South v. Baker*, 62 A.3d 1, 15 (Del. Ch. 2012).

'are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer.'"[83]

Rojas identifies only one alleged red flag—the *Spann* settlement—which he characterizes as the "ultimate red flag."[84] According to the Complaint:

> The disclosure of the [*Spann*] action and the settlement terms thereof put the full Board on notice that the Company's pricing policies violated Consumer Protection Laws and that a lawsuit resulting from the use of false reference pricing had already had a material impact on the Company's finances and would do so again in the future if the Company continued to violate the law.[85]

Defendants respond with two arguments. First, they contend that the Complaint's "allegations fail to plead any particularized facts supporting the inference that the *Spann* settlement put the directors on notice of *ongoing* violations of law" so as to establish that it was a red flag.[86] Second, they contend that, even if the *Spann* settlement was a red flag, plaintiff's answering brief "confirms that the Company responded to the *Spann* settlement extensively and apprised the Board of its response."[87] The court agrees with defendants' first point, which is dispositive of plaintiff's argument under the second prong of *Caremark*.

---

[83] *Wood v. Baum*, 953 A.2d 136, 143 (Del. 2008) (quoting *In re Citigroup Inc. S'holders Litig.*, 2003 WL 21384599, at *2 (Del. Ch. June 5, 2003)).

[84] Pl.'s Answering Br. 11; Tr. 59.

[85] Compl. ¶ 89; *see also id.* ¶ 83.

[86] Def.'s Reply Br. 10 (Dkt. 22) (internal quotation marks omitted).

[87] *Id.* at 16.

Describing Ms. Link's presentation to the Board on September 17, 2015, the Complaint alleges that she "presumably" explained that:

> the Company had settled the [*Spann* action] for $50 million in cash and other non-monetary relief, including JCP's proposed agreement that going forward its advertising and pricing practices would not violate the Consumer Protection Laws and that it would implement a method by which to monitor, train, and audit the Company's compliance with the law no less than annually.[88]

The Complaint and documents incorporated therein confirm what plaintiff alleges Ms. Link presumably explained to the Board.

According to the Complaint, the parties to the *Spann* action "notified the court [in September 2015] that they had agreed on settlement terms . . . which included continued oversight of the Company's pricing policies."[89] The Settlement Agreement, which was filed with the court two months later, states in more specific terms that "JCPenney shall implement a compliance program, which will consist of periodic (no less than once a year) monitoring, training and auditing to ensure compliance with California's price comparison laws."[90] It also represents that "JCPenney agrees that its advertising and pricing practices *as of the date of this*

---

[88] Compl. ¶ 88.

[89] *Id.* ¶ 82.

[90] *Id.* Ex. B § 6.1.7; *id.* ¶ 95.

*Settlement Agreement*, and continuing forward, will not violate Federal or California law, including California's specific price-comparison advertising statutes."[91]

The critical flaw in plaintiff's "red flag" argument is that the Complaint relies on conclusory rhetoric to charge J.C. Penney's directors with knowledge of wrongdoing. Rojas does not allege—as he must—particularized *facts* from which it reasonably can be inferred that the *Spann* settlement put the directors on notice of any ongoing violations of law. In particular, the Complaint does not allege *facts* from which it can be inferred that any of the members of the Demand Board were aware that the Company had violated any California or other laws regulating pricing practices at any time before (or after) the district court approved the *Spann* settlement.

To the contrary, per the Complaint's allegations, when the *Spann* action was discussed with the Board in September 2015, it was in terms of a settlement to resolve a consumer class action without any admission of liability, with an express acknowledgement that the Company was not then violating any federal or California laws, and with a commitment to implement a program to ensure continued compliance with California's price-comparison laws going forward. Also, when the *Spann* settlement was approved by the district court one year later, J.C. Penney

---

[91] *Id.* Ex. B § 6.1.7 (emphasis added).

represented to the court that it had "implemented a new price-comparison advertising policy in direct response to" the *Spann* action, pursuant to which J.C. Penney "created a Promotional Pricing Governance Committee," "instituted regular training sessions," and "created a new position, Director of Pricing Compliance, whose primary responsibility is to monitor and ensure compliance with the new pricing policy."[92]

Citing four federal decisions, Rojas contends that "settlements and warnings" can "constitute red flags, even absent a liability determination."[93]  This is true, of course.  A settlement of litigation or a warning from a regulatory authority— irrespective of any admission or finding of liability—may demonstrate that a corporation's directors knew or should have known that the corporation was violating the law.  But the obverse also is true—such actions do not necessarily demonstrate that a corporation's directors knew or should have known that the corporation was violating the law.[94]  When such events become a "red flag" depends

---

[92] *Id.* ¶ 8; *id.* Ex. C at 2.

[93] Pl.'s Answering Br. 38.

[94] *See, e.g.*, *In re Chemed Corp., S'holder Deriv. Litig.*, 2015 WL 9460118, at *18 (D. Del. Dec. 23, 2015) (finding that subpoenas *alleging* wrongdoing are "certainly something to be taken into consideration along with a plaintiff's other red flag allegations" but that subpoenas "do not on their own suggest that a board was aware of corporate misconduct") (alterations and internal quotation marks omitted), *adopted by KBC Asset Mgmt. NV v. McNamara*, 2016 WL 2758256 (D. Del. May 12, 2016); *In re Intel Corp. Deriv. Litig.*, 621 F. Supp. 2d 165, 175 (D. Del. 2009) (declining to "place great weight on a 'preliminary' finding" by a European Commission investigation that a company had infringed the European Commission Treaty and finding that the court "therefore cannot conclude that

on the circumstances. Here, the facts of the four federal cases on which Rojas relies demonstrate how dissimilar they are from the alleged facts here on the key issue of the directors' knowledge of wrongdoing.

In *In re McKesson Corporation Derivative Litigation*,[95] the lead case on which Rojas relies, the corporation entered into a settlement with the Department of Justice in 2008 that required it to implement a controlled substance monitoring program. The Northern District of California found the allegations sufficient to establish demand futility where certain directors "continued a pattern of noncompliance" after the corporation settled.[96] Specifically, the audit committee failed to take action even after receiving "regular signals" during at least five meetings that the monitoring program it had established in connection with the settlement "was failing and required more attention."[97]

_____

the directors now face a 'substantial likelihood' of liability for having allegedly ignored the EC investigation").

[95] 2018 WL 2197548 (N.D. Cal. May 14, 2018).

[96] *Id.* at *10.

[97] *Id.* at *7-10. As Rojas points out, the district court referred to the settlement with the Department of Justice as the "first" of multiple red flags. *Id.* at *7. Unlike here, however, where Rojas has failed to allege any facts to support the inference that J.C. Penney's directors were aware of ongoing violations of law at the time of the *Spann* settlement, the plaintiff in *McKesson* alleged that "the members of McKesson's board of directors at the time" of the 2008 settlement "knew that McKesson had serious problems concerning the Company's compliance with controlled substances laws and regulations for many years and spread across many of the Company's facilities." *Id.* (internal quotation marks omitted).

29

In *In re Abbott Laboratories Derivative Shareholders Litigation*,[98] the Seventh Circuit sustained a *Caremark* claim where the board allegedly was alerted to continuing violations on numerous occasions after Abbott entered into a Voluntary Compliance Plan with the FDA, causing the FDA to close out the plan for noncompliance.[99] The court summarized the allegations as follows:

> Given the extensive paper trail . . . concerning the violations and the inferred awareness of the problems, the facts support a reasonable assumption that there was a "sustained and systematic failure of the board to exercise oversight," in this case intentional in that the directors knew of the violations of law, took no steps in an effort to prevent or remedy the situation, and that failure to take any action for such an inordinate amount of time resulted in substantial corporate losses, establishing a lack of good faith. We find that six years of noncompliance, inspections, 483s, Warning Letters, and notice in the press, all of which then resulted in the largest civil fine ever imposed by the FDA and the destruction and suspension of products which accounted for approximately $250 million in corporate assets, indicate that the directors' decision to not act was not made in good faith and was contrary to the best interests of the company.[100]

In *In re Pfizer Inc. Shareholder Derivative Litigation*,[101] the Southern District of New York found demand to be futile where plaintiff alleged "a large number of reports made to members of the board from which it may reasonably be inferred that

---

[98] 325 F.3d 795 (7th Cir. 2003).

[99] *Id*. at 799-802, 808-09.

[100] *Id.* at 810.

[101] 722 F. Supp. 2d 453 (S.D.N.Y. 2010).

they all knew of Pfizer's continued misconduct and chose to disregard it" after three prior settlements with the government.[102] The allegations included:

> reports to the board of the Neurontin and Genotropin settlements, a large number of FDA violation notices and warning letters, several reports to Pfizer's compliance personnel and senior executives of continuing kickbacks and off-label marketing, and the allegations of the *qui tam* lawsuits. Many of these disturbing reports were received during the same time that the board was obligated by the 2002 and 2004 CIAs to pay special attention to these very problems.[103]

And, in *Rosenbloom v. Pyott*,[104] the Ninth Circuit found that the board acted with the necessary scienter because the board not only was aware of and ignored ongoing violations of law, but directly participated in illegal conduct:

> These allegations and the inferences that reasonably follow from them . . . show that Allergan's board closely monitored off-label Botox sales and repeatedly discussed or authorized programs even after learning that those programs involved the same illegal conduct for which Allergan was ultimately fined and punished.[105]

In sum, in each of the four cases just discussed, stockholders presented strong factual allegations of *board knowledge of ongoing legal violations* in the wake of federal government enforcement proceedings (*McKesson*, *Abbott*, and *Pfizer*) and a guilty plea in a criminal case (*Rosenbloom*). Factual allegations of this nature are precisely what is missing here. Tacitly conceding as much, Rojas suggests that

---

[102] *Id.* at 455-57, 460.

[103] *Id.* at 460-61 (citations omitted).

[104] 765 F.3d 1137 (9th Cir. 2014).

[105] *Id.* at 1152-53.

31

"regardless of whether wrongdoing occurred," the sheer amount of the settlement payment ($50 million) and the fact that the Company "lost multiple motions" in the *Spann* action should satisfy his pleading burden under Court of Chancery Rule 23.1.[106] The court disagrees.

The *Spann* action was a purely civil matter of the type that commercial parties routinely settle after motion practice. It was not brought against the backdrop of a prior settlement where clear, repeated violations of a law had been found. Indeed, the reference pricing claims in the *Spann* action were not clear cut—as demonstrated by the fact that two California courts later disagreed (in the California Action) over whether Section 17501 of the California Business & Professions Code is unconstitutionally vague.[107] The cost of the *Spann* settlement, although sizeable, secured a release from a state-wide class of California consumers as part of a compromise without any admission of liability.

Our law is clear that "to establish oversight liability a plaintiff must show that the directors *knew* they were not discharging their fiduciary obligations or that the directors demonstrated a *conscious* disregard for their responsibilities such as by failing to act in the face of a known duty to act."[108] Thus, a complaint must allege

---

[106] *See* Pl.'s Answering Br. 35.

[107] *See supra* Section I.D.

[108] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 123 (Del. Ch. 2009) (Chandler, C.); *see also Reiter*, 2016 WL 6081823, at *7.

32

particularized facts to show "that the directors knew or should have known that the corporation was violating the law" in order to state a claim under the second prong of *Caremark*.[109] In my view, the sheer amount of the *Spann* settlement payment and the posture of the case when it settled are far from sufficient in the context of the overall circumstances to support the inference of scienter necessary to demonstrate that J.C. Penney's directors acted in bad faith.

Finally, I disagree with Rojas' contention that this court's decision in *Horman v. Abney*[110] supports finding that the *Spann* settlement is a red flag. In *Horman*, the court explained in dictum that a settlement could be a red flag if the company (UPS) "had entered the [settlement] and then continued a pattern of non-compliant [cigarette] shipments immediately thereafter."[111] In this case, by contrast, J.C. Penney's pricing practices have never been found—as part of a settlement or in any adjudication—to be "non-compliant" in the first place, and there are no well-pled allegations in the Complaint that the Board ever became aware that the Company failed to implement the procedures required under the *Spann* settlement.

At bottom, Rojas asks the court to find that J.C. Penney's directors have demonstrated a *conscious* disregard for their responsibilities simply because, less

---

[109] *Qualcomm*, 2017 WL 2608723, at *2 (internal quotation marks omitted).

[110] 2017 WL 242571.

[111] *Id.* at *11.

33

than three months after the district court approved the *Spann* settlement, the Los Angeles City Attorney initiated coordinated civil proceedings against J.C. Penney and three of its competitors asserting complex price-comparison claims that have been disputed vigorously, and because a single consumer filed suit in Kansas over a pair of earrings in a case that has been settled on an individual basis. Given the lack of any particularized factual allegations to support a reasonable inference that the members of the Demand Board knew or should have known that the Company was violating the law at any time before (or after) those actions were filed, it would be unwarranted to make such a finding and the court declines to do so.

\* \* \* \* \*

For the reasons explained in Sections II.A and II.B above, Rojas has failed to allege facts sufficient to support a reasonable inference that the members of the Demand Board are exposed to a substantial likelihood of personal liability under either prong of *Caremark*. Accordingly, Rojas has failed to plead adequately that demand would have been futile under either of those theories.

## C. The Demand Board Is Not Conflicted Because of the Pendency of the California Action

Rojas argues lastly that demand should be excused "because bringing the claims at issue in this Action would be tantamount to admitting liability in the"

California Action.[112] In making this argument, Rojas relies on this court's decisions in *Pfeiffer v. Toll*[113] and *In re Fitbit, Inc. Stockholder Derivative Litigation*.[114]

In *Pfeiffer*, a stockholder asserted a derivative claim to recover damages resulting from alleged insider trading. The court found that demand was futile under *Rales* because a majority of the board members were defendants in a "companion federal securities action" that had survived a motion to dismiss and in which the district court "held that the insider trading of the individual defendants—essentially the same trades at issue here—raised a 'powerful and cogent inference of scienter' and was 'unusual in scope and timing.'"[115] In *Fitbit*, which also involved allegations of insider trading, the court similarly considered as "a relevant factor in the *Rales* analysis" the exposure certain directors faced in a related securities action.[116]

Both of these cases are readily distinguishable because none of the members of the Demand Board is a party to the California Action where the Company is the only defendant, and thus none of them has any personal exposure in that action.[117]

---

[112] Pl.'s Answering Br. 54.

[113] 989 A.2d 683 (Del. Ch. 2010), *abrogated on other grounds by Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831 (Del. 2011).

[114] 2018 WL 6587159 (Del. Ch. Dec. 14, 2018).

[115] 989 A.2d at 690 (citation omitted).

[116] 2018 WL 6587159, at *16.

[117] *See Guttman v. Huang*, 823 A.2d 492, 504 (Del. Ch. 2003) (Strine, V.C.) (not considering the implications of a companion federal securities action for demand futility purposes where "none of [five outside director] defendants is even named as a defendant in the pending federal securities suits"); *Rattner v. Bidzos*, 2003 WL 22284323, at *14

For this reason, the court has no reason to doubt whether any members of the Demand Board could consider a demand impartially based on the pendency of the California Action.

## III.  CONCLUSION

For the reasons explained above, the court concludes that plaintiff has failed to allege facts from which it may reasonably be inferred that any of the directors on the Demand Board consciously allowed J.C. Penney to violate any price-comparison advertising laws so as to demonstrate that they acted in bad faith.  Accordingly, Rojas has failed to establish that his failure to make a demand should be excused, and the Complaint is hereby dismissed with prejudice in its entirety.

**IT IS SO ORDERED.**

---

(Del. Ch. Sept. 30, 2003) (finding that "conclusory and cryptic allegations" about which, if any, of the director defendants also were defendants in a companion federal securities action were insufficient to merit demand excusal under *Rales*).